# 14-2581-cv

## United States Court of Appeals
### *for the*
## Second Circuit

———————————

IN RE MAGNUM HUNTER RESOURCES
CORPORATION SECURITIES LITIGATION

————————————————

EDWARD PAIGE,

*Plaintiff-Appellant*,

MARY PAPPAS, THE ILNAF TRUST, MIKE GRETSCHEL, MARK
HINNAU, DAVID MACATTE, Individually and on behalf of all others similarly
situated, ANTHONY ROSIAN, Individually and on behalf of all others similarly
situated, SHAUN FOSTER, Individually and on behalf of all others similarly
situated, TEDDY ATCHLEY, Individually and on behalf of all others similarly
situated,

*Plaintiffs*,

*(For Continuation of Caption See Inside Cover)*
————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFF-APPELLANT

COHEN MILSTEIN SELLERS & TOLL PLLC
*Attorneys for Plaintiff-Appellant*
1100 New York Avenue, NW
West Tower, Suite 500
Washington, DC 20005
(202) 408-4600

v.

MAGNUM HUNTER RESOURCES CORPORATION, GARY C. EVANS,
RONALD D. ORMAND, FRED J. SMITH, JR., H.C. "KIP" FERGUSON, III,
J. RALEIGH BAILES, SR., VICTOR G. CARILLO, BRAD BYNUM,
STEPHEN C. HURLEY, JOE L. MCCLAUGHERTY, STEVEN A. PFEIFER,
JEFF SWANSON, CREDIT SUISSE SECURITIES (USA) LLC, CITIGROUP
GLOBAL MARKETS INC., DAVID S. KRUEGER, JAMES W. DENNY, III,

*Defendants-Appellees.*

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................ 1

JURISDICTIONAL STATEMENT ....................................................... 1

ISSUES PRESENTED ............................................................................ 2

STATEMENT OF THE CASE ............................................................... 3

SUMMARY OF THE ARGUMENT ..................................................... 5

STATEMENT OF FACTS ...................................................................... 6

    **A.**   **Magnum Hunter Failed to Implement Adequate Internal Controls** .................................................................................. 8

        1.   Lack of Internal Controls Over NGAS Accounting ......................... 8

        2.   Lack of Internal Controls Over Joint Interest Billing Accounting .... 8

        3.   Lack of Internal Controls Over Acquisitions and Valuation ...........10

    **B.**   **Magnum Hunter Also Suffered From Inadequate Staffing in Accounting** ...........................................................................12

    **C.**   **In the Midst of Its Deficient Control Environment, the Company Repeatedly and Falsely Represented to Investors That Controls Were Adequate** ........................................................................14

    **D.**   **The Offering** ..................................................................................17

    **E.**   **The Truth Emerges** .....................................................................18

STANDARD OF REVIEW ...................................................................19

ARGUMENT .........................................................................................20

  **I.**   **LEGAL STANDARD FOR 12(b)(6) MOTIONS** ...................................20

  **II.**   **THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES EXCHANGE ACT CLAIMS** ........................................................21

    **A.**   **The District Court Ruled in Error that Plaintiffs Failed to Allege that the Exchange Act Defendants' Statements Were False or Misleading and Made with Scienter** ........................................22

        1.   Defendants' Statements Were Materially False or Misleading ........22

i

      2.    Plaintiffs Sufficiently Alleged Scienter Under Second Circuit Standards ....................................................................27

         (a)    Plaintiffs Sufficiently Pled Recklessness ............................27

         (b)    The District Court Erred In Disregarding Plaintiffs' Confidential Witness Allegations .........................................36

  **B.**    **Plaintiffs Adequately Pled Loss Causation** ...................................41

**III.** **PLAINTIFFS' SECURITIES ACT CLAIMS ARE TIMELY** ...............45

  **A.**    **Plaintiffs' Securities Act Claims Are Governed by a One-Year Statute of Limitations Which Under *Merck* Is Triggered by Discovery of the Wrongdoing, Not Inquiry Notice** .........................45

  **B.**    **A Reasonably Diligent Plaintiff Could Not Have Discovered Sufficient Facts to Plead a Plausible Securities Act Claim Until April 16, 2013** ...................................................................48

      1.    The Disclosures Made on October 22, 2012 Had the Intended Effect of Marginalizing the November 14, 2012 Disclosures .......................................................................49

      2.    The November 14, 2012 Disclosures Falsely Reassured the Company's Investors .................................................52

  **C.**    **Even If the Limitations Period Was Triggered on November 14, 2012, Plaintiffs' Claims Against Certain Securities Act Defendants Are Still Timely** .................................................................54

      1.    Plaintiffs Aare Entitled to the Benefits of Relation Back ...............54

      2.    Plaintiffs Are Entitled to Equitable Tolling ....................................57

**CONCLUSION** .......................................................................59

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Abrams v. Baker Hughes Inc.*,
   292 F.3d 424 (5th Cir. 2002)................................................................38, 39, 40

*Acito v. IMCERA Group, Inc.*,
   47 F.3d 47 (2d Cir. 1995).................................................................................38

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*,
   106 F.3d 11 (2d Cir. 1997)...............................................................................54

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
   693 F.Supp.2d 241 (S.D.N.Y. 2010) ...............................................................28

*Amorosa v. AOL Time Warner Inc.*,
   409 Fed. App'x 412 (2d Cir. 2011) ..................................................................51

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).....................................................................................20, 28

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F.Supp.2d 474 (S.D.N.Y. 2004) ..........................................................23, 29

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)...............................................................................21

*Bear Stearns Mortg. Pass-Through Certificates Litig.*,
   851 F.Supp.2d 746, 762-63 (S.D.N.Y. 2012) ...........................................46, 52

*Bensinger v. Denbury Res., Inc.*,
   No. 10-CV-1917, 2013 WL 3353975 (E.D.N.Y. July 3, 2013)........................54

*Brown v. Earthboard Sports USA, Inc.*,
   481 F.3d 901 (6th Cir. 2007)............................................................................35

*In re Cabletron Sys., Inc.*,
   311 F. 3d 11 (1st Cir. 2002) ............................................................................33

iii

*Caiafa v. Sea Containers Ltd.*,
    331 Fed. App'x 14 (2d Cir. 2009) ...............................................................20, 37

*Caiola v. Citibank, N.A., New York*,
    295 F.3d 312 (2d Cir. 2002) .......................................................................32

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014) .................................................................41, 42

*In re Chaus Sec. Litig.*,
    801 F.Supp. 1257 (S.D.N.Y. 1992) .............................................................59

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
    701 F.Supp.2d 506 (S.D.N.Y. 2010) ............................................................49

*City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011).................................................................46, 47

*In re Complete Mgmt. Sec. Litig.*,
    153 F.Supp.2d 314 (S.D.N.Y. 2001) ............................................................55

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003).......................................................................56

*Dura Pharms., Inc. v. Broudo*
    544 U.S. 336, 342 (2005).....................................................................41, 44

*In re Direxion Shares ETF Trust*,
    No. 09 Civ. 8011, 2012 WL 717967 (S.D.N.Y. Mar. 6, 2012) ........................46

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003).......................................................................42

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    MDL No. 1446, 2004 WL 405886 (S.D. Tex. Feb. 25, 2004) ..........................51

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
    469 F.Supp.2d 88 (S.D.N.Y. 2006) .............................................................36

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.*,
    858 F.Supp.2d 306 (S.D.N.Y. 2012) ............................................................46

iv

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
618 F.Supp.2d 311 (S.D.N.Y. 2009) ................................................50

*Freidus v. Barclays Bank PLC*,
734 F.3d 132 (2d Cir. 2013) ....................................... 47, 49, 52, 53

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) ............................................................21

*In re Gilat Satellite Networks, Ltd.*,
No. 02-1510, 2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005) ..........55

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ............................................................20

*LC Capital Partners, L.P. v. Frontier Ins. Grp.*,
318 F.3d 148 (2d Cir. 2003) ............................................................52

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ............................................................41

*Matrixx Initiatives, Inc. v. Siracusano*,
131 S.Ct. 1309 (2011) ......................................................................22

*Merck & Co. v. Reynolds*,
130 S.Ct. 1784 (2010) ........................................................ 45, 46, 50

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014) ....................................... 20, 24, 25, 26

*In re MF Global Holdings Sec. Litig.*,
982 F.Supp.2d 277 (S.D.N.Y. 2013) ...............................................27

*Milman v. Box Hill Sys. Corp.*,
72 F.Supp.2d 220 (S.D.N.Y. 1999) .................................................52

*Monroe County Emps. Ret. Sys. v. YPF Sociedad Anonima*,
980 F.Supp.2d 487 (S.D.N.Y. 2013) ...............................................56

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) ............................................................32

v

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
No. 09 Civ. 2137, 2012 WL 2899356 (S.D.N.Y. July 16, 2012) ......................46

*New Orleans Emps. Ret. Sys. v. Celestica*,
455 Fed. App'x 10 (2d Cir. 2011) .....................................................36

*Newman v. Warnaco Grp., Inc.*,
335 F.3d 187 (2d Cir. 2003) ......................................................47, 49

*Novak v. Kasaks*,
216 F.3d 300 (2000).................................................................*passim*

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ......................................................41, 44

*In re Oxford Health Plans, Inc. Sec. Litig.*,
51 F.Supp.2d 290 (S.D.N.Y. 1999) ............................................35, 40

*Pace v. DiGuglielmo*,
544 U.S. 408 (2005).......................................................................57

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012) ...........................................................45

*Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*,
730 F.3d 263 (3d Cir. 2013).......................................................46, 59

*Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco, Inc.*,
No. 09 Civ. 6966, 2011 WL 1198712 (S.D.N.Y. Mar. 30, 2011) ..............34, 35

*Police & Fire Ret. Sys. of Detroit v. IndyMac MBS, Inc.*,
721 F.3d 95 (2d Cir. 2013)..............................................................56

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
No. 13-30580, 2014 WL 4931411 (5th Cir. Oct. 2, 2014)...................41, 42, 43

*Pub. Emps. Ret. Sys. v. Merrill Lynch & Co.*,
714 F.Supp.2d 475 (S.D.N.Y. 2010) ................................................46

vi

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) ........................................................................ 39, 40

*In re S. African Apartheid Litig.*,
  617 F.Supp.2d 228 (S.D.N.Y. 2009) ............................................................ 55

*In re Sadia, S.A. Sec. Litig.*,
  643 F.Supp.2d 521 (S.D.N.Y. 2009) ............................................................ 39

*Sec. and Exchange Comm'n v. Kelly*,
  663 F.Supp.2d 276 (S.D.N.Y. 2009) ............................................................ 23

*In re Simon II Litig.*,
  211 F.R.D. 86 (E.D.N.Y. 2002) ................................................................... 54

*Staehr v. Hartford Fin. Servs. Grp.*,
  547 F.3d 406 (2d Cir. 2008) ........................................................................ 50

*Stevelman v. Alias Research Inc.*,
  174 F.3d 79 (2d Cir. 1999) ........................................................ 19, 33, 34, 35

*In re Take-Two Interactive Sec. Litig.*,
  551 F.Supp.2d 247 (S.D.N.Y. 2008) ............................................................ 44

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) ........................................................................ 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ......................................................................... 5, 27, 28

*In re Top Tankers, Inc. Sec. Litig.*
  528 F.Supp.2d 408 (S.D.N.Y. 2007) ............................................................ 31

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) .................................................................................... 22

*Varghese v. China Shenghuo Pharm. Holdings*,
  672 F.Supp.2d 596 (S.D.N.Y. 2009) ............................................................ 35

*In re Veeco Instruments, Inc. Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006) ........................................................... 35, 40

*Villante v. Dep't of Corr. of City of New York*,
   786 F.2d 516 (2d Cir. 1986) ...................................................................54

*In re Wachovia Equity Sec. Litig.*,
   753 F.Supp.2d 326 (S.D.N.Y. 2011) .......................................................46, 56

STATUTES

15 U.S.C. §77 *et seq.* ................................................................. 1, 45, 46

15 U.S.C. §78aa ...................................................................................1

15 U.S.C. §78u-4(b)(2)(A) ...................................................................27

28 U.S.C. §§1331 and 1337 .................................................................1

28 U.S.C. §1658(b) .............................................................................46

Private Securities Litigation Reform Act ........................... 20, 27, 36, 58

Sarbanes-Oxley Act of 2002 ...........................................................17, 18

OTHER AUTHORITIES

Fed. R. Civ. P. 9(b) ............................................................................59

Fed. R. Civ. P. 12(b)(6)...........................................................5, 20, 42

Fed. R. Civ. P. 15(c) .................................................. 53, 54, 55, 56

Fed. R. Civ. P. 23 ..........................................................................57, 58

## PRELIMINARY STATEMENT

Lead Plaintiff Edward Paige and additional plaintiffs Delaware County Employees Retirement Fund ("DelCo"), Mark Hinnau, and Mike Gretschel ("Plaintiffs") appeal from an Opinion and Order (the "Order") of the U.S. District Court for the Southern District of New York (Forrest, J.) dismissing Plaintiffs' amended complaint (the "Complaint") (A-34)[1] for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder; and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l(a)(2), and 77o.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1337; Section 27 of the Exchange Act (15 U.S.C. §78aa); and Section 22 of the Securities Act (15 U.S.C. §77v). The District Court entered its order dismissing Plaintiffs' claims against Defendants[2] on June 23, 2014. SPA-1. Plaintiffs timely filed a notice of appeal on July 22, 2014. A-472.

---

[1] Documents in the Joint Appendix are cited as "A-___." Documents in Plaintiffs-Appellants' Special Appendix are cited as "SPA-___."

[2] Defendants are Magnum Hunter Resources Corporation ("Magnum Hunter" or the "Company"); CEO and Board Chairman Gary C. Evans, Executive VP and CFO Ronald D. Ormand, Chief Accounting Officer ("CAO") David S. Krueger, Executive VP of Exploration H.C. "Kip" Ferguson, III, and CAO Fred J. Smith, Jr. (the "Exchange Act Defendants"); and

1

## ISSUES PRESENTED

1.     Whether the District Court erred in granting Defendants-Appellees' motions to dismiss on the ground that Plaintiffs-Appellants failed adequately to allege that statements made by Defendants-Appellees were false and/or misleading.

2.     Whether the District Court erred in granting Defendants-Appellees' motions to dismiss on the ground that there is no factual basis to infer that at the time Defendants-Appellees made statements to investors about the adequacy of the Company's internal controls, they knew of or recklessly disregarded contemporaneous and material deficiencies in the Company's internal controls.

3.     Whether the District Court erred in granting Defendants-Appellees' motions to dismiss on the basis that Plaintiffs-Appellants failed adequately to allege loss causation.

4.     Whether the District Court erred in granting Defendants-Appellees' motions to dismiss the Securities Act claims on the basis that the claims are time-barred.

---

Directors J. Raleigh Bailes, Sr., Victor G. Carillo, Brad Bynum, Stephen C. Hurley, Joe L. McClaugherty, Steven A. Pfeifer, Jeff Swanson, Credit Suisse Securities (USA) LLC, and Citigroup Global Markets Inc. (the latter two being the "Underwriter Defendants," and all, together with Evans, Ormand, and Krueger, being the "Securities Act Defendants").

2

## STATEMENT OF THE CASE

For more than a year, from January 17, 2012 to April 22, 2013 (the "Class Period"), Defendants repeatedly represented to investors, in filings with the Securities Exchange Commission ("SEC"), that they had investigated the internal controls of Magnum Hunter, evaluated them, and found them adequate. These representations were critically important to investors given the Company's rampant growth. In reality, however, internal controls were anything but what Defendants claimed. Accounting staff were unqualified and insufficient in number; staff assigned to some of the Company's most critical accounting functions never allowed anyone to review completed work and lacked the competence to perform their tasks; accounting improprieties reported to management were summarily ignored; manual "quick-fix[es]" were used to reconcile figures related to joint interests, causing bills to be paid twice, while advance payments were commingled with amounts owed; at least one executive ordered a member of the accounting staff to improperly fabricate production numbers throughout her tenure; there was a complete lack of internal auditing; and certain accounting functions were performed externally by an affiliate of the Company's CEO.

Operating with these severely deficient internal controls, it was reckless for Defendants to certify in the Company's SEC filings that its internal controls were sound. Yet Defendants did so repeatedly. Even when the Company made

3

qualified disclosures about discrete instances of material weaknesses in internal controls, it was quick to reassure investors that those material weaknesses were limited in scope and either had been or would be remedied.

On April 16, 2013, investors learned the truth when the Company filed a current report with the SEC on Form 8-K – the Company had terminated its auditor, PricewaterhouseCoopers ("PwC"), but not before PwC brought a whole host of internal control deficiencies and material weaknesses to the Company's attention that PwC had discovered during its audit of the Company's internal controls for the 2012 fiscal year. These deficiencies and material weaknesses were more severe and broader in scope than anything previously disclosed. Six days later, the Company revealed a letter from PwC stating that (i) PwC disagreed with the Company's account of its parting; (ii) information had come to PwC's attention that, in its opinion, materially impacted the Company's financial statements; (iii) Magnum Hunter did not have documentary support for accounting entries related to core operations; (iv) none of the issues could be resolved to PwC's satisfaction prior to its dismissal; and (v) PwC had advised the Company to evaluate the impact of "tone at the top" on its control environment. Magnum Hunter's stock price plunged in reaction, causing harm to Plaintiffs and other Class Members.

## SUMMARY OF THE ARGUMENT

The District Court's dismissal should be reversed because it failed to consider multiple and essential alleged facts. Paramount is the District Court's utter disregard for the well-pled accounts of nearly all nine confidential witnesses, which collectively (along with PwC's findings that internal control deficiencies existed during 2012) raise a strong inference that Defendants knew or recklessly disregarded facts that rendered their statements to investors false. Moreover, the District Court failed to apply the correct analysis mandated for Rule 12(b)(6) motions, which requires that the District Court accept all alleged facts as true and in the light most favorable to Plaintiffs. Instead, and in error, the District Court adopted Defendants' version of the facts. Finally, and most critically, the District Court held that Defendants' version of events comprised an inference of innocence that was "*equally* plausible" as Plaintiffs' inference of scienter (SPA-31(Order at 31) (emphasis added)) – a finding that, under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), compelled a holding that Plaintiffs had adequately alleged scienter, but the District Court held the opposite.

In addition, the District Court construed the standard for falsity too narrowly; failed to correctly apply the Second Circuit's standard for inferring scienter based on Defendants' recklessness; and misapprehended the standard for loss causation. Finally, the District Court misconstrued applicable standards for

5

the Securities Act's statute of limitations and improperly dismissed Plaintiffs' Securities Act claims.

## STATEMENT OF FACTS

Magnum Hunter is an oil and gas company that engages in the acquisition, exploration, exploitation, development, and production of crude oil, natural gas, and natural gas liquids.  A-38(¶2).  Although Magnum Hunter has not reported a profitable quarter since its current management team took over in 2009, the Company reported quarter after quarter of tremendous asset growth throughout the Class Period as it conducted a purchasing spree whereby it acquired the assets of other companies using money it raised from offerings of its securities to Plaintiffs and other members of the putative Class.  A-38-39(¶3).  Because the Company grew so substantially and so quickly, and in the absence of reporting profits, the integrity of Magnum Hunter's internal and financial controls – particularly with respect to its accounting for reserves and acquisitions – played a vital role to both the Company and its investors.

During this period of meteoric growth, Magnum Hunter dismissed and then parted ways with two auditors.  Magnum Hunter selected its previous auditor Hein & Associates LLP ("Hein") for FY 2012, but dismissed it, then engaged PwC for nine months before dismissing it after PwC's audit revealed that "internal controls" at the Company "did not exist."  A-66-67,72,93-97(¶¶77,87,119).  On April 16,

2013, Magnum Hunter ultimately revealed sixteen internal control weaknesses (related to the lack of an effective control environment to meet the Company's growth, financial reporting, leasehold property costs and division of interest records, complex accounting issues, and miscellaneous other control deficiencies) and nine areas that PwC had identified for further investigation because PwC's findings caused it to believe these areas may have a material impact on the Company's prior financial statements (related to property accounting and transfers of unproved properties, oil and gas reserves and division of interest of properties, income taxes, accounting for the Magnum Hunter Production subsidiary and NGAS Resources, Inc. ("NGAS"), prior period restatements, the Company's ability to meet debt covenants, capitalized interest, assets held for sale, and miscellaneous other matters). A-450-54(April 16, 2013 Form 8-K);[3] A-93-97(¶119). Magnum Hunter's public Class Period statements gave investors no idea that, in reality, the Company was operating without the internal controls it assured the public that it had. Instead, prior to its April 16, 2013 announcement, the Company had only revealed a single error in October 2012 and one additional error and three discrete internal control issues of very limited scope in November 2012 that it promised investors it was remediating.

---

[3] The details of each category are described more fully in the Form 8-K.

### A. Magnum Hunter Failed to Implement Adequate Internal Controls

#### 1. Lack of Internal Controls Over NGAS Accounting

Various witnesses described the Company's unaudited and problematic accounting for its acquisition of NGAS, which was a critical failure in internal controls not disclosed by the Company until subsequently identified by PwC. A-451(April 16, 2013 Form 8-K); A-93-97(¶119). CW1, an accounting department contract employee at the Company for six months and then a full-time accounting manager from February to August 2012 who reported to Corporate Controller Derek Smith ("D. Smith"); CW4, a staff accountant at Magnum Hunter from July 2011 until July 2012; and CW6, a senior accountant at the Company from August 2011 through July 2012, all described how NGAS accounting was handled solely by Sandy Owens who was secretive and territorial, was always far behind in her tasks, and lacked adequate "technical expertise." A-53,57-59(¶¶51,62,66).

#### 2. Lack of Internal Controls Over Joint Interest Billing Accounting

CW1 described a lack of internal controls over accounting for joint interest billing ("JIB") – the same problem later identified by PwC. A-93-97(¶119); A-448(April 16, 2013 Form 8-K). CW1 stated that D. Smith favored manual readjustments because he was looking for a "quick fix," even though this violated protocol and made reconciliation of amounts owed by joint interest partners difficult. A-54-55(¶¶53,54). CW1's several conversations with D. Smith about the

8

inaccuracies in billing caused by – and left unresolved due to – D. Smith's use of the manual true-up process went unheeded, and D. Smith overrode any solutions CW1 offered. *Id.* CW1 further noted that Magnum Hunter lacked an in-house internal audit function. A-51-53(¶¶48,50). For example, CW1 described how Mandy Pettus, a staff accountant, made decisions related to payables even though her responsibilities were limited to cutting checks, and how she admitted to CW1 that there was no oversight of her decisions; moreover, the Company allowed accountants responsible only for providing journal entries to also post them. A-52-53(¶50).

CW5 similarly complained about JIB practices that persisted under D. Smith's supervision. CW5 indicated that upon instruction from D. Smith, several individuals who worked for D. Smith would make journal entries to move funds from a joint interest partner's advance account to various other accounts. A-58-59(¶64). CW5 was ultimately forced to track this information on her own spreadsheet, since the advance account on the general ledger was unreliable and inaccurate. *Id.* According to CW5, this practice continued for well over a year, until PwC confirmed it was "totally wrong" and corrected it. *Id.*

Similarly, CW1 described how the staff were very frustrated with the JIB accounting system and "there was no cooperation and no direction." A-54-55(¶54). There were real consequences to the substandard practices in place. On

9

occasion invoices were paid twice because of the haphazard accounting. *Id.* CW5 further stated that she depended on the receipt of JOAs (joint agreements outlining the payout structures and specificities of the agreements) from the Land Department to do her work accurately, but was never provided copies of them during her tenure. A-58(¶63). Without this information, CW5 could not be certain that figures pertaining to the details or financial coding of the joint-interest projects were correct. *Id.*

### 3. Lack of Internal Controls Over Acquisitions and Valuation

The lack of sufficient internal controls had other manifestations, including a failure to correct the persistent abuse of data reporting. For example, CW3, an engineering technician who facilitated the reporting of daily oil production levels at Magnum Hunter from September 2012 to May 2013, and who reported directly to Defendant Ferguson, VP of Exploration, described how Ferguson requested that production numbers at the Eagle Ford project be manipulated. A-56-57(¶¶60-61). Despite CW3's responsibility to enter the numbers into an Excel spreadsheet directly from gauge read reports, Ferguson would consistently request up to three times a week – and "pretty much the whole time I worked there," according to CW3 – that CW3 fabricate the numbers in either direction so that the wells' production levels looked more consistent over time, thus surpassing the expected performance curve. *Id.*

10

During the entire period that Ferguson manipulated well production numbers, he claimed to investors that the raw production at the Eagle Ford site was exceptional, stating at an August 12, 2012 investor presentation that the wells were "clearly exceeding" the expected "decline curve" in production. A-74(¶92). Ferguson then boasted in an article published for *E&P* on October 22, 2012, that "[o]ne of the things about our area in the Eagle Ford is that *it is very predictable* …. *Bottom line, we added about a 20% increase over our average I[nitial] P[roduction] for our operated wells, which is amazing*." A-77-78(¶97).

In addition to fabricated Eagle Ford production numbers, Magnum Hunter had generalized problems with certain valuation methods the Company used to determine unproved and proved oil and gas reserves, according to CW2. A-55(¶56). CW2 stated that PwC, which had been hired in July 2012, could not find sufficient documentation for the property claimed to be owned by Magnum Hunter or its drilling rights. A-55-56(¶57). CW8, who was employed in 2013, recounted how the Company would regularly rush into acquisitions and projects without adequate staffing or oversight, relying instead on the attitude, "you figure it out, PwC," to make the numbers eventually work out. A-60(¶68).

11

**B.      Magnum Hunter Also Suffered From Inadequate Staffing in Accounting**

Long before the Company's April 16, 2013 disclosure confirming its egregious lack of sufficient qualified personnel, Magnum Hunter was aware of the problem but failed to correct it.  For instance, CW1 explained that D. Smith had only six months' experience as a controller, would not take any advice, and was "very confused and very hard to deal with, because he was [a] 'revenue and not [a] 'journal entries'"-trained person, the latter being the kind of training needed for oil and gas accounting.  A-52,54-55(¶¶49,54).  Indeed, CW5, a Senior JIB Accountant at Magnum Hunter from May 2011 to April 2013, confirmed D. Smith was "in over his head."  A-58-59(¶64).   In addition, D. Smith's lack of experience was exacerbated by his practice of purposely hiring less-experienced staff so that the Company did not have to pay for JIB accountants who had the level of experience necessary for the type of business Magnum Hunter did, according to CW1. A-52(¶49).

The lack of experience among accounting staff meant they were not accustomed to terminology germane to the gas and oil industry, which led to accounting mistakes, as CW1 explained.  A-52(¶49).  The critical importance of niche skills was highlighted in the experience of CW9, an employee in accounts payable at GreenHunter Energy from 2008 to June 2010 who reported to

12

Defendant Krueger and who worked directly on GreenHunter's provision of accounting services to Magnum Hunter beginning in January 2010. A-60-61(¶69).[4] CW9 stated that her seven years' experience in accounting was no match for the skills required to understand idiosyncratic oil and gas accounting tasks. *Id.* Despite her confusion, CW9 received no new training because of Krueger's "mentality" and that of GreenHunter to just "do the work, they didn't necessarily want to train you or take the time." *Id.* This was not the only example of inadequate staffing: even Krueger de-prioritized his responsibilities as CAO, instead spending all his time running the books for GreenHunter, according to CW7, who was Manager of Financial Reporting at GreenHunter from September 2012 until October 2013. A-60(¶67).

Compounding the problem of unqualified employees was that there were not even enough *underqualified* people to handle all the work at Magnum Hunter. There was significant understaffing in the accounting department given the Company's growth, according to CW2, who worked for the Company and assisted in the preparation of all Magnum Hunter's financial reports from approximately January 2011 to June 2013. A-55-56(¶¶56,58). Likewise, CW8, the Financial Reporting Manager at Magnum Hunter from January 2013 until September 2013,

---

[4] Plaintiffs inadvertently stated in the Complaint that Krueger's employment ended in October 2011 instead of October 2012.

reported that "you cannot grow at Magnum's speed without upgrading personnel, technology, and management," which Magnum failed to do. A-60(¶68). So significant were the staffing deficiencies, which lasted the entirety of CW2's employment, that "it seemed common that things would be filed late because a lot of people had to do a lot of things" and never "caught up." A-56(¶58).

**C.  In the Midst of Its Deficient Control Environment, the Company Repeatedly and Falsely Represented to Investors That Controls Were Adequate**

On the first day of the Class Period, January 17, 2012, Magnum Hunter issued a press release informing investors of its "exponential[]" growth at a 235% increase in proved reserves from "unconventional resource plays" in 2011 over 2010, and that this growth had motivated further borrowing. A-61-63(¶70). But days later on January 30, the Company announced that this estimate included miscalculations. A-63-64(¶75). Between October 2012 and April 2013, the Company made announcements acknowledging certain accounting discrepancies but minimized them each time as limited, discrete problems, while using each opportunity to reassure investors of the Company's sound internal controls. *See, e.g.*, A-75-77, 81-85(¶¶95,105).

In particular, the October 12, 2012 Form 8-K announced "an inadvertent error" related to "calculation of non-cash share-based compensation" while assuring investors that "[n]ew procedures and controls [we]re being implemented

14

to ensure that information required to be disclosed … is recorded, processed, summarized and reported." A-75-76(¶95). The Company then further disclosed on November 14, 2012, in a restated 2Q 2012 Form 10-Q, that it had discovered (1) "an error" in "the sale of Series A Convertible Preferred Units"; and (2) lack of effective controls over (i) "complex accounting matters" because of a lack of an "effective control environment" "principally related to equity instruments" such as "convertible preferred stock and related arrangements"; (ii) the "timel[iness]" of monthly and quarterly period-end financial reporting; and (iii) "share-based compensation." A-81-83(¶105).

Even though in this November announcement the Company stated that its "disclosure controls" "were not effective," it limited this disclosure only to June 30, 2012 – the Company did ***not*** disclose the full panoply of internal control weaknesses over the entire 2012 fiscal year, discovered by PwC and later disclosed in April 2013 – and it restricted the disclosure to material weaknesses relating to the three limited and specific accounting issues, above. *Id.* Although the District Court focused on the Company's disclosure of a lack of "an effective control environment" in November 2012 (SPA-32(Order at 32)), the District Court overlooked the Company's simultaneous qualification stating that this finding "principally related to … convertible preferred stock and related arrangements" – the first of the three discrete, limited issues that were the subject of the November

15

2012 filing. A-81-83(¶105). Thus, Defendants did not disclose in either October or November 2012 the massive internal control problems that existed at the time, as described by witnesses and confirmed by PwC's findings later announced on April 16, 2013.

Finally, the District Court's contention that Defendants "continually disclosed ongoing weaknesses" in November 2012, February 2013, and March 2013 (SPA-32(Order at 32)), is incorrect. The February 2013 disclosure and March 2013 disclosure were each merely a recitation of the October and November 2012 disclosures, again reassuring investors that those discrete problems were being remediated and adding updates that the Company was *still* working to finish its audit with PwC, and nothing more. A-90-91(¶¶116-17). A second March 2013 disclosure was the announcement of an impairment charge related to unproved oil properties – *not* disclosure of any additional "ongoing weaknesses." A-92-93(¶118). In short, the Company made no additional disclosures related to internal control weaknesses from November 2012 to April 2013, and its disclosure on April 16, 2013 of sixteen important areas of internal control weaknesses, and nine areas that merited further investigation, far surpassed the three limited disclosures in November 2012 that it continually assured investors were being remediated.

Nonetheless, despite deficiencies at Magnum Hunter that began by at least 2010 and that witnesses reported persisted well into 2013, Magnum Hunter assured

16

investors over and over again in its SEC filings of the integrity of its controls, verifying in the certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") in its 2011 Form 10-K (issued on February 29, 2012) and its 1Q, 2Q, and 3Q 2012 Forms 10-Q (issued on May 3, August 9, and November 14, 2012) that its CEO and CFO had "[e]valuated the effectiveness of the [Company's] disclosure controls and procedures" and disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting…." A-67-68(¶78); *see also* A-66-67,70-71,73,86(¶¶77,83-84,90,108).[5]

In reality, the purported financial integrity of Magnum Hunter's accounting practices and internal control procedures was illusory – a fact not only confirmed by confidential witnesses and corroborated by PwC, but also verified by the CAO himself: Fred J. Smith, Jr. ("F. Smith") stated on his *curriculum vitae* published on LinkedIn.com that, upon his arrival at Magnum Hunter months later in October 2012, he "*[i]nherited* various accounting issues … and [a] *multiple material internal control weakness[es] environment.*" A-47-48(¶28).

### D. The Offering

On May 3, 2012, amidst its positive statements to investors about the soundness of its internal controls, the Company announced that it intended to offer

---

[5] Defendants Evans and Ormand were the signatories to the Company's SOX certifications filed during the Class Period. A-67-68(¶78).

$450 million in aggregate principal amount of senior notes due in 2020. A-72(¶86). A concurrent public offering of 35,000,000 shares of Magnum Hunter's common stock (the "Offering") was also announced. *Id.* On May 11, 2012, it was announced that the shares offered in the Offering were being priced at $4.50 per share and in the private notes offering at 98.646% of the principal amount. *Id.* On May 16, 2012, the Company completed both offerings which had been issued by means of a Registration Statement dated January 18, 2012 and prospectus supplement dated May 11, 2012 (collectively, the "Offering Documents"). *Id.*

### E.     The Truth Emerges

After announcing a series of discrete accounting issues in October and November 2012 that the Company minimized with reassurances, at each turn, of improved internal controls, and disclosing (but intentionally downplaying) limited defects in its internal controls, Magnum Hunter disclosed on April 16, 2013 that ongoing, pervasive defects in its internal controls over financial reporting and material weaknesses in its internal financial and tax reporting capacities remained, precluding the Company from timely reporting audited 2012 financial results and requiring that it obtain waivers from its lenders as to debt covenants. A-40-41(¶6). Specifically, the Company's April 16, 2013 announcement disclosed that PwC had been terminated by the Company, but not before PwC had identified a host of material weaknesses in the Company's accounting.

18

Days later, on April 22, 2013, Magnum Hunter further disclosed that PwC disagreed with Magnum Hunter's account of their parting, disclosing a letter from PwC, sent April 18, 2013, stating that PwC did "not agree with the statements concerning" whether there had been any "reportable events" as defined in Item 304(a)(1)(v) of Regulation S-K under the Securities Act, relating to PwC's engagement as the Company's independent registered public accounting firm. A-97-98(¶121). In response to these disclosures on April 16 and 22, Magnum Hunter's share price plunged more than 67% to close at $2.50 per share on April 22, erasing more than $878.5 million in market capitalization. A-98-99(¶123).

Finally, on June 14, 2013, Magnum Hunter disclosed that "on April 26, 2013, we were advised by the staff of the SEC Enforcement Division that the SEC had commenced an inquiry into matters disclosed in certain of our SEC filings and press releases, as well as the sufficiency of our internal controls and our decisions to change auditors ...." A-99(¶124).

## STANDARD OF REVIEW

The Court of Appeals "review[s] *de novo* a district court's order dismissing a complaint on the pleadings and accept[s] as true all facts alleged in the complaint." *Novak v. Kasaks*, 216 F.3d 300, 305 (2000) (citing *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 83 (2d Cir. 1999)).

19

# ARGUMENT

## I.  LEGAL STANDARD FOR 12(b)(6) MOTIONS

Even given the strictures of the Private Securities Litigation Reform Act ("PSLRA"), at the motion to dismiss stage, "dismissal is appropriate only where appellants can prove no set of facts consistent with the complaint that would entitle them to relief." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 249 (2d Cir. 2014) (addressing Securities Act claims) (citation omitted).  Only then will "[a] dismissal [be] upheld." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (addressing Exchange Act claims).  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  The Court must "construe plaintiffs' complaint liberally, 'accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff[s'] favor." *Caiafa v. Sea Containers Ltd.*, 331 Fed. App'x 14, 16 (2d Cir. 2009) (reviewing Securities Act claims) (brackets in original); *Jinkosolar*, 761 F.3d at 249 (same) (citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Appellants have met that standard here.

## II.  THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES EXCHANGE ACT CLAIMS

To state a claim under Section 10(b) of the Exchange Act "and the corresponding Rule 10b-5, a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).    To state a claim for control person liability under Section 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).[6]

---

[6] Because Plaintiffs have adequately alleged a primary violation of the Exchange Act by Magnum Hunter and because the individual Exchange Act Defendants exercised control over the Company, Plaintiffs have sufficiently alleged Section 20(a) claims against the individual Exchange Act Defendants.  The District Court did not rule on Plaintiffs' Section 20(a) claims.

**A.** **The District Court Ruled in Error that Plaintiffs Failed to Allege that the Exchange Act Defendants' Statements Were False or Misleading and Made with Scienter**

    **1.** **Defendants' Statements Were Materially False or Misleading**

An omitted fact is material, and a statement misleading, if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available'" to investors. *Matrixx Initiatives*, *Inc. v. Siracusano*, 131 S.Ct. 1309, 1318 (2011) (citation omitted). Because materiality is a mixed question of law and fact, the materiality of an omitted fact may be resolved as a matter of law, and a plaintiff's claims dismissed, only if the alleged omission is "so obviously important [or unimportant] to an investor, that reasonable minds cannot differ on the question of materiality." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

The District Court's analysis with regard to falsity resulted in the incongruous holding that Defendants' false statements were not actionable notwithstanding that Magnum Hunter *admitted* that miscalculations had occurred (A-61-63(¶¶70-71)) and issued a restatement *admitting* that the Company's financial statements contained errors and that material weaknesses existed (A-73-

74(¶¶90-91)).[7]  Moreover, with respect to certain other statements regarding the adequacy of the Company's internal controls (A-66-68,70-72,86-87(¶¶77-79,83-85,108-09)), which are alleged to have been misleading because they omitted material facts about the state of those controls,[8] the District Court began its analysis by improperly presuming, without basis, that such statements were not misleading because Defendants' discovery of the internal control deficiencies was gradual – "defendants recognized problems … and then recognized more problems."  SPA-25(Order at 25).  But this is not what Plaintiffs alleged, and the District Court is bound to "accept as true all facts alleged in the [C]omplaint" for purposes of its analysis.  *Novak*, 216 F.3d at 305.  Plaintiffs alleged that the Company was fraught with major internal control deficiencies during 2011 and 2012, and Defendants knew so ***at the time*** (but failed to tell investors) because nine confidential witnesses have confirmed Defendants' contemporaneous knowledge or reckless disregard of well-known failures in internal controls.  Moreover, PwC

---

[7] "[T]he mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made."  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 486 (S.D.N.Y. 2004).  Moreover, "under Generally Accepted Accounting Principles ('GAAP'), a restatement issues only when errors are material."  *Sec. and Exchange Comm'n v. Kelly*, 663 F.Supp.2d 276, 285 (S.D.N.Y. 2009).

[8] The Company's Offering Documents contained the same omissions and was thus misleading.  A-99-100(¶126); *see also* Section III, *infra*.

confirmed during its audit of the 2012 fiscal year that a lack of internal controls existed during that time. A-81-85(¶¶95,105).[9]

This case is similar to *Jinkosolar*, decided by this Court a few months ago. There, the defendants made various disclosures about Chinese pollution regulations, the potential for the company's operations to cause serious pollution problems, and the steps the company was taking to avoid those problems. 761 F.3d at 250. The company's description of pollution-preventing equipment and 24-hour monitoring teams "gave comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations." *Id.* at 251. Although the Court noted that such compliance may sometimes be unobtainable, a fact reasonable investors are deemed to know, investors nonetheless "would be misled by a statement … if in fact" the measures taken as part of those reassurances "fail[ed] to prevent substantial violations of the Chinese regulations." *Id.* The Court thus found that Jinkosolar's failure to disclose these ongoing serious problems could be found by a trier of fact to be "an omission that renders misleading the comforting statements … about compliance measures" the company had made to investors. *Id.* As such, this Court unequivocally held that

---

[9] Given witnesses' accounts of internal control deficiencies during 2012 and PwC's corroboration of those accounts, the District Court erred by characterizing Plaintiffs' allegations as "'[a]llegations of … 'accounting irregularities, **standing alone**.'" SPA-25(Order at 25) (emphasis added).

the *Jinkosolar* complaint sufficiently alleged "that the failure to disclose that the prophylactic steps were then failing to prevent serious ongoing pollution problems rendered [the company's] description misleading." *Id.* at 250.

The analogy of *Jinkosolar* to this case is clear. Here, Defendants made disclosures in SOX certifications that they had designed and evaluated the effectiveness of the Company's internal controls and had disclosed all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting. A-67,70-71,73,86(¶¶78,83-84,90,108). Those statements were clearly false given witnesses' descriptions of contemporaneous conditions in 2012 and PwC's subsequent confirmation of those conditions during that time period. Further, the limited discrete disclosures Magnum Hunter made in October and November 2012 were false for the same reasons: Defendants disclosed a few isolated problems they were confronting while failing to disclose numerous substantial internal control problems existing throughout 2012. Thus, as in *Jinkosolar*, there is no question that the Complaint adequately alleges falsity.

Finally, the District Court focused too narrowly on Defendants' own hedging in their disclosures. For instance, the Court held that Defendants' March 18, 2013 statements that they "might 'identify additional material weaknesses'" as they completed their restatement cut against a finding that

25

pre-April 16, 2013 statements were false. SPA-26,33(Order at 26, 33).[10] But this is not the test for falsity – the test is whether, at the time Defendants made the allegedly false SOX certifications in 2011 and 2012, *those* certifications were materially false or misleading. Plaintiffs have plausibly pled that they were – and with respect to certain of those SOX certifications, Defendants have *admitted* they were false. A-73-74(¶¶90-91). Moreover, a "generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability," because "'[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.'" *Jinkosolar*, 761 F.3d at 251 (citation omitted).

Separately, the District Court held in error that Plaintiffs did "not allege with particularity that Ferguson's statements to investors" regarding the Eagle Ford site (A-74-75,77-79(¶¶92-93,97,99,100)) "were materially false" because Ferguson's remarks were "optimis[tic]" predictions "shown only after the fact to have been unwarranted." SPA-28,34(Order at 28,34). Ferguson touted the predictability and superior performance of the Eagle Ford oil wells: they "exceed[ed]" a standard

---

[10] In addition, the District Court held that PwC's April 18, 2013 letter, disclosing a disagreement with the Company's description of their parting, "does not show that the earlier SEC filing [on April 16, 2013] contained any actionable misstatement." SPA-27(Order at 27). But Plaintiffs did not allege that the April 16 disclosure contained a misstatement. To the contrary, the April 16 filing is alleged to be a corrective disclosure. *See* Section II.B., *infra*.

"decline curve"; production proved to be "very predictable"; and the production history was one of positive growth owed to the Company's skill in drilling. A-74,77-78(¶¶ 92,97,99).[11]  All these statements falsely described the Eagle Ford production levels, which were improved by numbers that Ferguson himself contemporaneously fabricated – a fact that eviscerates any reading that his statements were "optimism" about the as-yet unknown well performance.

### 2. Plaintiffs Sufficiently Alleged Scienter Under Second Circuit Standards

#### (a) Plaintiffs Sufficiently Pled Recklessness

To adequately allege scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that [Defendants] acted with the required state of mind."  15 U.S.C. §78u-4(b)(2)(A).  In *Tellabs*, the Supreme Court articulated the standards for pleading a "strong inference" of scienter under the PSLRA: a motion to dismiss must be denied if, after a "holistic[]" analysis of all the facts together, "a reasonable person would deem the inference of scienter cogent" and "at least as compelling as any opposing inference one could draw from the facts alleged."  551 U.S. at 324, 326.  Thus, at "'the motion to dismiss stage, a tie on scienter goes to the plaintiff.'"  *In re MF Global Holdings Sec. Litig.*, 982 F.Supp.2d 277, 320

---

[11] Ferguson stated that the Eagle Ford site had a material impact on income because the increased production that the Company had achieved was 20% – an amount that, if repeated, was "a significant enhancement of our income."  A-77-78(¶97).

(S.D.N.Y. 2013) (citation omitted). For this reason alone the District Court's ruling must be reversed, because the District Court itself held that Defendants' inference of nonfraudulent intent was "*equally* [as] plausible" as Plaintiffs' inference of scienter. SPA-31(Order at 31) (emphasis added). Because Plaintiffs' inference is thus "*at least as likely as*" Defendants' inference under *Tellabs*, Plaintiffs' allegations survive dismissal. *Tellabs*, 551 U.S. at 328 (emphasis added).

In any event, Plaintiffs' allegations plainly meet the standard for recklessness. In *Novak*, the Second Circuit reaffirmed that "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." 216 F.3d at 308.[12] *Novak* addressed allegations that a defendant company overstated its financial condition by accounting for inventory at inflated values that defendants knew to be obsolete and nearly worthless and by deliberately failing to adhere to the company's publicly-stated markdown policy. *Id.* at 304. Thus Defendants are liable where they "fail[]

---

[12] *Novak* is still good law and "[c]ourts in the Southern District routinely apply" the Second Circuit's rulings on scienter even after "the Supreme Court's recent decisions." *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F.Supp.2d 241, 283 (S.D.N.Y. 2010) (referring to *Iqbal* and *Tellabs*, among others, and citing *Novak* on use of confidential witnesses); *see also* SPA-15,18,20 (Order at 15,18,20 (citing *Novak*)).

to review or check information that they had a duty to monitor." *Id.* at 308. Here, the Complaint satisfies this standard.

For example, Plaintiffs' nine confidential witnesses described various internal control deficiencies that were widely known by employees and the Company's controller during 2011 and 2012 and either known or recklessly disregarded by Defendants. *See infra* at pp.30-31 & n.13. The Company announced on April 16, 2013 that PwC had identified during its audit sixteen areas of internal control weaknesses that had been ongoing ***during*** the 2012 fiscal year, as well as various areas that required further investigation, which corroborated the ***same*** problems witnesses described as contemporaneously known at the Company. A-450-54. These allegations support an inference of scienter based on recklessness. *Novak*, 216 F.3d at 308; *In re Atlas Air*, 324 F.Supp.2d at 492 n.9 ("[T]he allegations concerning deficient internal controls bolster[] the other factual allegations in the Complaint that tend to show that the [] defendants recklessly issued the company's financial statements."). Indeed, the correlation between PwC's findings of conditions during 2012 and witnesses' independent descriptions of those same conditions is entirely at odds with the District Court's inference that Defendants discovered small discrete areas of problems, only then to discover more. The District Court thus erred when it summarily concluded that Defendants' disclosures beginning in October 2012 were indicative of a game of "catch up"

29

during which the Company disclosed "in dribs and drabs" all it had learned about its lack of internal controls. SPA-31(Order at 31).

In fact, on January 30, 2012, when the Company corrected its previously buoyant announcement about its 2010 to 2011 growth by revealing that its figures contained miscalculations, Defendants were placed on notice that there were problems with the Company's valuation of its assets. A-61-64(¶¶70,75). Any minor inquiry would have revealed the rampant lack of internal controls at the Company, which was well-known among accounting staff beginning in at least 2011 and well before any disclosures the Company made in 2012.[13] At minimum, an investigation of internal controls warranted an inquiry of the Company's controller, D. Smith, the direct supervisor of several confidential witnesses who described numerous weaknesses in internal controls as well as how those weaknesses were widely known among accounting staff. For example, (1) CW1, CW4, and CW6 detailed various known and rampant internal control problems and all directly reported to D. Smith, who reported to Defendant Krueger; and (2) CW9 reported directly to Defendant Krueger when providing accounting to Magnum

---

[13] *See, e.g.*, Statement of Facts, *supra*, describing reports by nine witnesses detailing: (1) chronic documentation problems; (2) understaffing and lack of oversight, an internal audit function, and qualified employees; (3) JIB accounting that was known to be improper at the time due to double payments, lack of paperwork from the land department, and the need for "quick-fix" true-ups, which PwC later confirmed was "totally wrong"; and (4) the fabrication of production numbers at Eagle Ford. The information provided by these CWs is powerful evidence of scienter, virtually ignored by the District Court.

Hunter.[14]  Plaintiffs' allegations thus do create a strong inference that Defendants were aware of or had access to contemporaneous information contradicting their statements to investors that the Company's internal controls were adequate.

Despite ongoing internal control deficiencies throughout the Class Period, Defendants falsely assured investors through their SOX certifications that they had affirmatively investigated the state of the internal controls at the Company and found them adequate.  A-66-68,70-71,73,86(¶¶77-78,83-84,90,108).  Courts have held that where, as here, Defendants affirmatively state in SOX certifications that they have evaluated internal controls and found them adequate, but then admit that they are not adequate, the SOX certifications give rise to an inference of scienter.  Otherwise, SOX certifications would have no meaning.  For example, in *In re Top Tankers, Inc. Securities Litigation*, the plaintiff, "relying on words out of [the CEO]'s mouth – [pled] that [the auditor] resigned over disputes with Top Tankers concerning accounting practices, and did so notwithstanding the client's ultimate acquiescence in its recommendation that earnings be restated.  If true, this admits of an inference that there was some deficiency in Top Tankers' internal controls,

---

[14] *See, e.g.*, Statement of Facts, *supra*.  The scienter of D. Smith and Defendants Krueger and Ferguson supports a finding of corporate scienter, since they are the type of senior managers whose scienter can be imputed to the Company.  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("[I]t is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant.").

which makes the SOX certifications more important." 528 F.Supp.2d 408, 415 (S.D.N.Y. 2007). Similarly here, Magnum Hunter's auditor, PwC, identified (and the Company ultimately acknowledged) deficiencies in internal controls that persisted during the same time period in which Defendants represented in SOX certifications that they had investigated internal controls and that no material weaknesses existed. As such, the SOX certifications, together with other allegations, supports an inference of scienter. *Id.* at 415-16.

Critically, the District Court failed to address the fact that even after Defendants' limited disclosure in October 2012 about one single accounting problem, certain Defendants continued to sign ***additional*** SOX certifications before finally revealing the truth to investors on April 16, 2013.[15] In short, Defendants continued to misleadingly assure investors that they had affirmatively inspected and evaluated the Company's internal controls and that their

---

[15] The October and November 2012 announcements barely scratched the surface of the Company's problems: the October announcement disclosed an "inadvertent error" and the November announcement disclosed an additional "error" as well as material weaknesses related to three discrete items. *See* pp.14-16, *supra*. Neither disclosure covered anywhere near the bulk of ***new*** disclosures made on April 16, 2013, which demonstrated the breadth and severity of the Company's material weaknesses and lack of internal controls throughout 2012. A-449-58. Moreover, the November 2012 disclosure also gave comfort to investors by stating that the Company had made various changes and even designed "Remediation Plans" to address the limited material weaknesses that had been disclosed. A-84(¶105). As this Court has held, once a company chooses to speak on an issue or topic, "it ha[s] a duty to be both accurate and complete." *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002). "Thus, when a speaker willingly makes a disclosure about a particular topic, whether voluntary or required, the representation must be 'complete and accurate.'" *In re Morgan Stanley Info. Fund Sec. Litig.*¸ 592 F.3d 347, 366 (2d Cir. 2010) (citation omitted).

investigation showed that those controls were adequate. Partial disclosures in "dribs and drabs," moreover, are not inconsistent with allegations that a Company is still withholding the full truth as Plaintiffs have alleged here. *See, e.g.*, *In re Cabletron Sys., Inc.*, 311 F. 3d 11, 36 (1st Cir. 2002) (reversing trial court's dismissal in case where the complaint alleged that partial disclosures made six months before the close of the class period were materially misleading because they "failed to disclose the full extent of th[e] problems").

In assessing Plaintiffs' allegations, the District Court relied in significant part on *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 83 (2d Cir. 1999), where the Second Circuit upheld a district court's rejection of allegations of scienter based on recklessness.[16] SPA-31,34(Order at 31, 34). However, the *Stevelman* allegations were a classic case of "fraud by hindsight" based solely on a company's announcement in its Form 10-K that it would retroactively "'change'" its revenue recognition "'accounting policy'" which resulted in a reduction in earnings and an increase in losses for the prior year covered by the Form 10-K. *Id.* at 82. The *Stevelman* plaintiff had alleged that defendants were reckless in previously announcing "positive revenue figures" because at the time, and under the old accounting policy, they alleged there could not have been a reasonable expectation

---

[16] Instead, the court in *Stevelman* held that scienter had been adequately pled based on allegations of insider trading and the timing of transactions. *Id.* at 79.

of payment. *Id.* at 82-83. The facts of the *Stevelman* case are dramatically different from what is alleged here. In *Stevelman*, the plaintiff had no confidential witness evidence in the complaint, the defendant had not conceded a lack of internal controls, and no auditor had concluded that material weaknesses existed. *Id.* at 82, 84-85. By contrast, each is alleged here, and each is a significant factor that supports an inference of scienter based on recklessness.

The District Court's reliance on *Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco, Inc.*, No. 09 Civ. 6966, 2011 WL 1198712 (S.D.N.Y. Mar. 30, 2011) (SPA-32(Order at 32)), is misplaced for similar reasons. In *Conseco*, the court found that many of the issues plaintiffs alleged had not been previously disclosed had, in fact, been "extensive[ly] disclose[d]" much earlier. *Id.* at *22. Moreover, the court in *Conseco* held that "defendants were unaware of any more severe material adverse information" because they had disclosed all the negative information that existed and further held that "much of what the plaintiff calls inadequate disclosures are simply pejorative characterizations of what was disclosed." *Id.* Those facts are distinct from what Plaintiffs have alleged here, which is that the severe internal control weaknesses disclosed on April 16, 2013 were known or recklessly disregarded long before and during the 2012 fiscal year – not, as in *Conseco*, that the April 16, 2013 disclosure itself was incomplete or its contents were previously disclosed. *Id.*

34

Plaintiffs' case here is thus in stark contrast to *Stevelman* and *Conseco*. As described above, nine confidential witnesses described a widespread failure in internal controls that was well-known at the Company. *See Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 918 (6th Cir. 2007) ("Specific factual allegations that a defendant ignored red flags … may support a strong inference of scienter."). Remarkably, all of this occurred in an environment where Defendants admitted that discrete mistakes had occurred in the Company's accounting but that those mistakes were being remedied, that Defendants had investigated the internal controls, and that internal controls were sound. "[A] failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter." *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (defendants' reduction of accounting staff by 75% in newly-acquired company, which plaintiffs alleged "result[ed] in a loosening of accounting control, constitute[d] strong circumstantial evidence of recklessness (if not conscious misbehavior)"); *accord Varghese v. China Shenghuo Pharm. Holdings*, 672 F.Supp.2d 596, 608 (S.D.N.Y. 2009) (similar); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F.Supp.2d 290, 294 (S.D.N.Y. 1999) (similar). Plaintiffs' allegations thus support an inference of scienter.

In addition to the accounting deficiencies described above, Defendants were also aware of a lack of internal controls related to oil and gas reserves. CW3

described a pattern and practice of Ferguson's manipulation of numbers over many months as part of a plan to artificially enhance the Company's results and change "his numbers to look good at the end of the year," and detailed how other supervisory personnel were suspicious of his conduct. A-56-57(¶¶60-61).[17] The District Court concluded, in error, that Plaintiffs failed to identify that the changed numbers were fraudulent or that "any specific numbers [] were changed." SPA-28(Order at 28).

### (b) The District Court Erred In Disregarding Plaintiffs' Confidential Witness Allegations

Second Circuit standards require that confidential sources be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314; *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469

---

[17] Ferguson's bogus excuses to change numbers, such as that Ferguson had spoken to the pumper himself, do not undermine Plaintiffs' allegations that he was in fact fabricating production numbers. A-57(¶61). CW3 received a set of data directly from gauge readers in the field, and CW3 described how Defendant Ferguson changed those numbers in a ***pattern*** that consistently replaced CW3's directly-reported numbers ***with more desirable numbers*** each time – a hallmark of fabrication. *Id.* CW3 even stated that she raised the issue of Ferguson's ***fabrication*** of numbers with upper management who confirmed to CW3 that they were investigating Ferguson's activities at Eagle Ford. *Id.* These allegations support an inference that Ferguson was, in fact, fabricating production numbers. *See New Orleans Emps. Ret. Sys. v. Celestica*, 455 Fed. App'x 10, 14 (2d Cir. 2011) ("[E]ven if plaintiffs could have described the content of the spreadsheets that [the witness] created for [defendants] in more detail, they provided sufficient facts as to who prepared [them], how frequently they were prepared, who reviewed them, and the issues they addressed to satisfy the particularity requirement of the PSLRA."). Moreover, the timing of Ferguson's fabrication of numbers also supports an inference of scienter, because the Company sold the Eagle Ford properties shortly thereafter in April 2013. A-47(¶ 27).

36

F.Supp.2d 88, 96-97 (S.D.N.Y. 2006) (quoting *Novak* and additional cases). Plaintiffs have done so here, yet the District Court gave short shrift to the allegations of confidential witnesses.[18] The District Court also entirely ignored that PwC's findings about a lack of internal controls in sixteen different areas concluded that these weaknesses in internal controls existed ***during*** the 2012 fiscal year. A-450(April 16, 2013 Form 8-K) (in conducting its audit "for the fiscal year ended December 31, 2012," PwC found that necessary internal controls "did not exist" and thus expanded the scope of its ongoing audit). Instead, the Court held that the use of witnesses "does not rectify the fact that [plaintiffs] do not adequately plead falsity" and that, instead, their descriptions support "an inference [that] is one of an oversight failure of management." SPA-26(Order at 26). Here again, the District Court misplaced its role and put itself in the role of the jury, assessing facts and drawing the conclusions it wanted, as opposed to recognizing that the facts – as Plaintiffs had pled them – stated a claim. *Caiafa*, 331 Fed.

---

[18] Plaintiffs alleged numerous accounts of internal control problems from nine different confidential witnesses who were in pertinent positions at the Company at relevant times. A-51-61(¶¶48-69). The District Court summarily dismissed the relevance of all these allegations and failed to address them, citing only three references to (1) F. Smith's concession of the state of internal controls upon his arrival in October 2012, (2) D. Smith's inexperience as a corporate controller, and (3) Defendant Krueger's lack of desire to train staff, and summarily concluded that these were not "specific facts allowing for a 'strong inference' that defendants acted recklessly." SPA-30-31(Order at 30-31). The District Court's reduction of Plaintiffs' allegations to these three items ignores the majority of the Complaint's factual allegations.

App'x at 16 (facts are construed liberally and reasonable inferences are drawn in Plaintiffs' favor).

Against this inaccurate summary of Plaintiffs' claims, the District Court applied the inapposite case *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (cited at SPA-32-33(Order at 32-33)). There, the Second Circuit found that a third FDA inspection at the defendant company that resulted in negative findings could not have been anticipated because two prior inspections had actually exhibited a ***drop*** in the number of violations the FDA cited. *Acito*, 47 F.3d at 52-53. The earlier FDA inspections that resulted in a decreasing number of violations thus corroborated an inference that the severity of the conditions cited in the third inspection had not been ongoing at the earlier times. Moreover, plaintiffs in *Acito* did not advance a single allegation from a confidential witness to rebut the presumption created by the pattern of FDA inspections. *Id.* Here, by contrast, Plaintiffs have alleged an important consistency between witness allegations about serious failures in internal controls during the Class Period and PwC's ultimate conclusions about conditions during the 2012 fiscal year. *See, e.g.*, A-52-53,55-60(¶¶50,51,56,58,62,66,68); *see also supra* at pp.29-31 & n.13.

The District Court further erred in holding that Plaintiffs' allegations support only an inference of mismanagement. The District Court relied on *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002), to reach this conclusion.

38

SPA-26(Order at 26). *Abrams*, however, involved "a planned improvement or upgrade" to a company's accounting systems by the "implementation of [a] new system," a process that resulted in the discovery of the need to issue a restatement due to "uncollectible accounts receivable, inventory write downs and unrecorded employee compensation." *Abrams*, 292 F.3d at 428-29, 433.[19] The plaintiffs in that case based their allegations entirely on defendants' alleged receipt of "unidentified" financial reports and did not base a *single* allegation on information provided by witnesses who had worked at the company. *Id.* at 431-32. The court there was thus compelled to conclude that the inconsistencies discovered by the accounting upgrade could be due to negligence because "plaintiffs point[ed] to ***no*** specific internal or external report available at the time of the alleged misstatements" or "any particular … information [] available to defendants" at the time their statements were made. *Id.* at 432-33 (emphasis added).

---

[19] The Second Circuit has clearly stated that mismanagement allegations are distinct from the reckless disregard of a stated policy: "poor business judgment is not actionable under section 10(b) and Rule 10b-5" but a "reckless failure to follow an announced policy" does support an inference of scienter. *Rothman v. Gregor*, 220 F.3d 81, 90-91 (2d Cir. 2000); *see also In re Sadia, S.A. Sec. Litig.*, 643 F.Supp.2d 521, 531-32 (S.D.N.Y. 2009) (rejecting a mismanagement defense because "there is considerable authority for the proposition that a company's failure to follow an internal policy can form the basis for an inference of recklessness") (citing *Novak*). Here, Plaintiffs have alleged that Defendants either failed to follow their policy of regularly evaluating internal controls, recklessly disregarded material weaknesses, or were fully aware of, but did not timely disclose, the very material weaknesses ultimately disclosed on April 16, 2013.

Here, by contrast, Plaintiffs have alleged pervasive, purposeful, and cost-driven accounting practices which management and executives pursued and implemented in full disregard of prudent internal controls, which go far beyond any attempt by Defendants to frame this case as one of mismanagement or innocuous GAAP irregularities. These facts rise above those in *Abrams*. Indeed, in *Novak*, the court rejected the "district court['s] belie[f] that the facts pleaded by the plaintiffs supported nothing more than an inference that the managers … disagreed over matters of business judgment" because the defendants there had pled recklessness by showing defendants' access to information that contradicted their public statements. *Novak*, 216 F.3d at 312. Similarly, here, based on information provided by nine confidential witnesses who describe pervasive internal control weaknesses ongoing at the time that Defendants made their false statements, Plaintiffs have pled a pattern of Defendants' awareness and/or reckless disregard of internal control deficiencies and a concomitant failure to take measured steps to eliminate those deficiencies – exactly the sort of facts that courts like *Novak* have found demonstrate a strong inference of scienter. *See Novak*, 216 F.3d at 308; *Rothman*, 220 F.3d at 91; *In re Veeco*, 235 F.R.D. at 232; *In re Oxford Health*, 51 F.Supp.2d at 294.

**B.      Plaintiffs Adequately Pled Loss Causation**

The Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo* required that

Plaintiffs allege a causal connection between an alleged material misrepresentation

and Plaintiffs' loss in order to demonstrate loss causation.   544 U.S. 336, 342

(2005).   The Court explained that Plaintiffs cannot satisfy this standard simply by

alleging the price was inflated at the time Plaintiffs purchased.   *Dura*, 544 U.S. at

347.   Rather, to demonstrate loss causation, Plaintiffs must allege that when the

"truth became known," the "share price fell," injuring investors.   *Id*.   This standard

is met when Plaintiffs allege that the Company "reveal[ed] some then-undisclosed

fact with regard to the specific misrepresentations alleged in the complaint" and

the share price fell in response.   *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d

501, 511 (2d Cir. 2010).   The facts that reveal this truth do not need to mirror prior

misstatements, so long as their disclosure "'reveal[s] to the market the falsity' of

the prior misstatements."   *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, No. 13-

30580, 2014 WL 4931411, at *5 (5th Cir. Oct. 2, 2014) (quoting *Lentell v. Merrill

Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005)).   This standard is not meant to

be a great burden on Plaintiffs and is only intended to give Defendants "some

indication of the loss and the causal connection that [] [P]laintiffs ha[ve] in mind."

*Dura*, 544 U.S. at 347; *see also Carpenters Pension Trust Fund of St. Louis v.

Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) ("Plaintiffs need not demonstrate

41

on a motion to dismiss that the corrective disclosure was the only possible cause for decline in the stock price.").

Here, the District Court held that "the April 2013 statements cannot be regarded as corrective disclosures" because the Company did not previously represent that the disclosed weaknesses "were the only control issues," had warned on March 18, 2013 that it may identify additional material weaknesses, and was facing "complex and challenging accounting issues." SPA-36(Order at 36).[20] This holding, however, overlooks that Defendants' disclosures on October 12, 2012 and November 14, 2012 are themselves alleged to have been false and misleading. A-77,86(¶¶96,109). It also overlooks that Defendants' March 18, 2013 statement concealed the chronic, overarching internal control problems that existed and that the Company was then at loggerheads with PwC over several aspects of its accounting practices. A-92-93(¶118). Investors did not know the full truth about the scope of the Company's internal control weaknesses until April 16, 2013.[21]

---

[20] This conclusion required the District Court to sit as a trier of fact, a role this Court has explained is inappropriate. *See Barclays PLC*, 750 F.3d at 233 (citing *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) ("[I]f the loss was caused by an intervening event, ... the chain of causation will not have been established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.")).

[21] A corrective disclosure does not have to be a single disclosure; "rather, the truth can be gradually perceived in the marketplace through a series of partial disclosures." *Amedisys, Inc.*, 2014 WL 4931411, at *6.

Indeed, it was not until April 16, 2013, when the Company announced the dismissal of its auditor, PwC, and reported a slew of PwC-identified internal control deficiencies, that investors began to learn the truth that the Company's internal controls were in far worse condition than they had been led to believe. A-93-97(¶119). As PwC discovered, the issues with the Company's internal controls concerned nearly every aspect of the Company's accounting. *Id.* The Company's share price declined 14.76% on heavy volume in response, providing further evidence that this information was something that the market did not previously know. A-97(¶120).[22]

Moreover, the Company further disclosed on April 22, 2013 that it had received a letter on April 18, 2013 from PwC clarifying that that PwC did "not agree with the [Company's April 16] statements concerning" whether there had been any "reportable events" relating to PwC's engagement as the Company's independent registered public accounting firm. A-97-98(¶121). PwC further stated that "[t]he increases in [its] audit scope and/or the additional investigation were triggered by discrepancies noted during [its] audit testing or the material weaknesses in the Company's internal control over financial reporting, among

---

[22] The facts disclosed here clearly removed the wool from investors' eyes – "a disclosure of mere confirmatory information will not cause a change in the stock price because the current price already reflects the information available[.]" *Amedisys*, 2014 WL 4931411, at *6.

other things" and that PwC had advised the Company to evaluate the impact of "tone at the top" on its control environment. *Id.* The Company's stock price further declined to $2.50 per share on heavy volume after this disclosure. *Id.*

These disclosures paint a very different picture than the one Defendants presented throughout the Class Period. Although on October 12, 2012 and on November 14, 2012 the Company announced that it identified material weaknesses, the announcements were *expressly limited* to three discrete areas. A-75-77,81-85(¶¶ 95,105).[23] The April 16 and 22, 2013 disclosures – which caused the Company's stock to decline almost 25% – subsequently "reveal[ed] some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint," *In re Omnicom*, 597 F.3d at 511; namely, that the Company's internal control issues extended to nearly every aspect of the Company's accounting. *In re Take-Two Interactive Sec. Litig.*, 551 F.Supp.2d 247, 290 (S.D.N.Y. 2008) (disclosure was sufficiently corrective where prior disclosure did "not necessarily constitute complete disclosure of the relevant truth").

Thus, Plaintiffs have given Defendants "some indication of the loss and the causal connection that the plaintiff has in mind," and adequately pled loss causation. *Dura*, 544 U.S. at 347.

---

[23] *See* pp.14-16, *supra* (discussing the three limited areas addressed by the November 2012 disclosure).

## III.   PLAINTIFFS' SECURITIES ACT CLAIMS ARE TIMELY

The Securities Act Defendants violated Sections 11, 12(a)(2), and 15[24] of the Securities Act  by omitting in the prospectus supplement for the Offering a warning or disclosure about the virtually non-existent internal controls at the Company, lack of oversight over the Company's accounting and financial reporting process, and inability to account for (or substantiate) transactions that impacted the Company's core operations in the oil and gas industry to such a profound extent that even the Company's auditor could not certify its financials for the year ending December 31, 2012.   A-116-17(¶126).   The District Court erroneously dismissed Plaintiffs' Securities Act claims, with prejudice, on the grounds that they were untimely.   SPA-37-44(Order at 37-44).   For the reasons below, this Court should reverse the District Court's ruling.

### A.   Plaintiffs' Securities Act Claims Are Governed by a One-Year Statute of Limitations Which Under *Merck* Is Triggered by Discovery of the Wrongdoing, Not Inquiry Notice

Section 13 of the Securities Act sets forth that Securities Act claims are timely if "brought within one year after the *discovery* of the untrue statement or the

---

[24] Section 11 creates liability for material misstatements or omissions in registration statements and Section 12(a)(2) creates liability for material misrepresentations in prospectuses, which, here, were incorporated into the Company's registration statements.  Section 15 imposes liability on individuals or entities that "control[] any person liable" under Sections 11 or 12(a)(2).  *See Panther Partners Inc. v. Ikanos Commc'ns, Inc*., 681 F.3d 114, 120 (2d Cir. 2012) (brackets in original) (citing 15 U.S.C. §§ 77k(a), 77l(a)(2), & 77o).

omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. §77m (emphasis added). The Supreme Court's decision in *Merck & Co. v. Reynolds*, 130 S.Ct. 1784 (2010), and the application of *Merck* in this and other Circuits makes clear that until a reasonably diligent plaintiff would have discovered the facts supporting its claims and could plead those facts – with sufficient detail and particularity to survive a motion to dismiss – the one-year statute of limitations does not begin to run. *See City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc*., 637 F.3d 169, 175 (2d Cir. 2011).[25] Furthermore, whether sufficient facts could have been discovered more than a year before a plaintiff filed its complaint is, "by definition, a fact-intensive inquiry and, thus, generally ill-suited for resolution at the motion to dismiss stage." *Bear Stearns*, 851 F.Supp.2d at 763. Thus, "a motion to dismiss will *only* be granted where

---

[25] Although *Merck* involved Exchange Act claims, the statutes of limitations for both Exchange Act and Securities Act claims use the term "discovery" as the event triggering the start of the applicable limitations period. *Compare* 28 U.S.C. § 1658(b) ("the **discovery** of the facts constituting the violation") *with* 15 U.S.C. § 77m ("the **discovery** of the untrue statement or the omission"). Since these "limitations provisions … are functionally identical," there is "no principled basis for cabining *Merck's* holding to [Exchange Act claims]." *Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F.Supp.2d 746, 762-63 (S.D.N.Y. 2012). As a result, many courts in this Circuit have concluded that "the inquiry notice standard no longer governs claims subject to Section 13" of the Securities Act. *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137, 2012 WL 2899356, at *2 (S.D.N.Y. July 16, 2012); *see also In re Wachovia Equity Sec. Litig.*, 753 F.Supp.2d 326, 370-71 & n.39 (S.D.N.Y. 2011); *Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F.Supp.2d 306, 319 (S.D.N.Y. 2012); *In re Direxion Shares ETF Trust*, No. 09 Civ. 8011, 2012 WL 717967, at *2 n.3 (S.D.N.Y. Mar. 6, 2012); *Pub. Emps. Ret. Sys. v. Merrill Lynch & Co.*, 714 F.Supp.2d 475, 480 (S.D.N.Y. 2010). *See also Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc*., 730 F.3d 263, 273 (3d Cir. 2013).

'uncontroverted evidence irrefutably demonstrates [that the] plaintiff discovered or should have discovered' facts sufficient to adequately plead a claim" before that date. *Id.* (emphasis added) (quoting *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 193 (2d Cir. 2003)).

Here, in their motions to dismiss, Defendants failed to irrefutably demonstrate by uncontroverted evidence that Plaintiffs should have discovered facts sufficient to state a claim before April 16, 2013, which is the relevant date for determining whether the claims are timely. Relying on *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138-39 (2d Cir. 2013), the District Court erroneously held that the limitations period was triggered by certain Company disclosures made in October and November 2012 that constituted "a sufficient 'constellation of facts' to satisfy either standard – either to put plaintiffs on inquiry notice or to lead a reasonably diligent plaintiff to have discovered those facts." SPA-38 (Order at 38). To the contrary, no reasonably diligent plaintiff would have had sufficient information by October and November 2012 to adequately plead the Securities Act claims alleged in the Complaint, nor was there sufficient detail available to allege a claim that would have survived a motion to dismiss.

**B.    A Reasonably Diligent Plaintiff Could Not Have Discovered Sufficient Facts to Plead a Plausible Securities Act Claim Until April 16, 2013**

Here, the running of the limitations period was triggered on April 16, 2013 with the issuance of a press release by the Company (A-448(April 16, 2013 Form 8-K)) stating that it had dismissed its auditor PwC "effective immediately" after PwC had notified the Company and its board of directors of *sixteen* actual or potential material weaknesses that were so significant that PwC could not complete its 2012 year-end audit or certify the accuracy of the Company's financials for the period ended December 31, 2012.  A-450-54(April 16, 2013 Form 8-K); *see also* Statement of Facts, *supra* (describing the sixteen items) and pp.14-16, *supra* (describing the distinct limited scope of earlier disclosures).   Until that date, Plaintiffs could not have discovered the existence or viability of their Securities Act claims.   Finally, in reaction to the April 16 press release, the price of the Company's common stock dropped by 15%, putting shareholders who had purchased in the Offering on notice of their injury and the extent of that injury – an indisputable element of Plaintiffs' claims.

Notwithstanding the clear import of the April 16 press release, the District Court instead held that the Company's October 22, 2012 and November 14, 2012 disclosures triggered the running of the Securities Act's statute of limitations. SPA-38-39(Order at 38-39) (holding that the 2012 disclosures constituted a

48

sufficient 'constellation of facts' to satisfy either standard….") (citing *Freidus*, 734 F.3d at 138-39)). However, Plaintiffs have alleged that those 2012 disclosures, in addition to falsely reassuring investors, were *in and of themselves* misleading to investors, and could not be deemed to have sufficiently put Plaintiffs on notice of their claims.

### 1. The Disclosures Made on October 22, 2012 Had the Intended Effect of Marginalizing the November 14, 2012 Disclosures

On November 14, 2012, the Company disclosed three internal control issues while reassuring investors at each turn that the issue had been resolved with remedial measures. *See supra* at pp.14-16 (describing the limited scope of the October and November 2012 disclosures). Given the Company's characterization and treatment of the minor accounting issues in the October and November 2012 disclosures, Plaintiffs cannot be held to have known that such disclosures indicated a potential Securities Act claim. *Newman*, 335 F.3d at 194 (holding, in context of discovery rule applicable to securities fraud claims, that warning signs of fraud did not place plaintiff on inquiry notice of injury); *see also Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F.Supp.2d 506, 514, 517 (S.D.N.Y. 2010) (Securities Act claims against underwriters were timely because "a fact finder could reasonably conclude that the pre-offering disclosures did not put the market on notice of the extent of iStar's financial problems – and that it was not until the issuance of the

49

2007 10-K that the nature of iStar's financial problems became clear" despite warnings in earlier quarterly filings describing a "trend in deteriorating performance") (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F.Supp.2d 311, 325 (S.D.N.Y. 2009) ("This Court cannot rule that the scattered disclosures in various amendments, annexes and exhibits to the Prospectus and Registration Statement were sufficient as a matter of law to disclose the material facts to reasonable investors.")).

It was not until the April 16, 2013 revelations that Plaintiffs could have been on notice that the internal control issues were anything but benign, and in fact permeated the entire Company and were so pervasive that PwC could not complete its audit. The District Court erred, however, by focusing on statements in the November 14, 2012 Amended Form 10-Q, that appeared to, but did not, describe a few of the issues announced in the April 16, 2013 press release. SPA-39-40(Order at 39-40). The District Court ignored that in the November 14, 2012 Amended Form 10-Q, Defendants downplayed the reasons for the amended filing, identifying them as related to narrow, non-core accounting issues. *Id.*[26]

---

[26] The District Court's reliance on the Second Circuit's pre-*Merck* decision in *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 427 (2d Cir. 2008), SPA-41(Order at 41), is misplaced because although it may be true that "an investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice," under the higher discovery standard in *Merck*, a Plaintiff must at least learn of the facts constituting the underlying violation. Here, that did not occur until April 16, 2013.

Importantly, that the 2012 disclosures failed to put Plaintiffs on notice of their claims is further supported by the fact that the November 14, 2012 disclosure resulted in a corresponding *increase* in Magnum Hunter's stock price.[27]   In contrast, the Company's stock price reacted immediately to the April 16, 2013 press release with a significant drop of 15%.  A-41(¶7).  Moreover, the April 16, 2013 press release, and not the October or November 2012 filings, prompted the SEC to launch an inquiry into the Company's internal controls, its auditor turnover, and disclosures made by the Company about its internal controls.  A-99(¶124).  Therefore, the earliest that the statute of limitations began to run on Plaintiffs' claims was April 16.  *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, MDL No. 1446, 2004 WL 405886, at *9 (S.D. Tex. Feb. 25, 2004) (the date the limitations period is triggered "requires a fact-specific examination" and consideration of circumstances such as a "sudden drop in stock price" or "an investigation").

---

[27] Although the Company's stock price declined less than 1.5% the first trading day after the November 14, 2012 Amended Form 10-Q was released to the market, over the following 90-day period, the price rebounded and traded at an average price that was nearly 15% above the pre-release market price.  Without a corresponding price decrease, a Section 11 claim would lack an essential element.  *See Amorosa v. AOL Time Warner Inc.*, 409 Fed. App'x 412, 416 (2d Cir. 2011) (explaining that a Section 11 claim requires a loss).

### 2. The November 14, 2012 Disclosures Falsely Reassured the Company's Investors

Moreover, the limitations period could not have been triggered by the November 14, 2012 Amended Form 10-Q because it falsely reassured investors with words of comfort. *See* pp.14-16, *supra*. "[R]eassuring statements will prevent" the statute of limitations from commencing "if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." *LC Capital Partners, L.P. v. Frontier Ins. Grp*., 318 F.3d 148, 155 (2d Cir. 2003) (recognizing that investor is not under duty to inquire as to possibility of securities fraud where "warning signs are accompanied by reliable words of comfort") (citing *Milman v. Box Hill Sys. Corp*., 72 F.Supp.2d 220, 229 (S.D.N.Y. 1999) ("[C]ourts have been reluctant to find that public disclosures provided inquiry notice where those disclosures were tempered with positive statements.")). The District Court erred when it held that Defendants' specific reassurances were trumped by the following boilerplate (and unclear) precautionary statement: "accounting and control deficiencies 'could result in misstatements … in a future annual or interim period that would not be prevented or detected.'" SPA-42(Order at 42). At minimum, whether these reassurances by the Company lulled a reasonable shareholder into taking no action presents a fact issue that is "ill-suited for resolution at the motion to dismiss stage." *Bear Stearns*, 851 F.Supp.2d at 763.

Further, the District Court's reliance on *Freidus* is misplaced. In *Freidus*, the Second Circuit held that the statute of limitations was triggered by a corrective disclosure made by the bank defendant in an unscheduled, unannounced trading update that specifically disclosed the company's "significant exposures to a deteriorating credit market whose fragility had recently been widely and publicly exposed," and further disclosed a £1.5 billion write down. *Freidus*, 734 F.3d at 139. Defendants' 2012 disclosures are starkly different in their portrayal of minor, non-core accounting issues accompanied by assurances that the problems were being remediated.

No reasonable Magnum Hunter investor could have discovered its Securities Act claims by November 14, 2012, given Plaintiffs have alleged that the "constellation of facts" that existed as of then was itself misleading because it failed to disclose the whole truth, was falsely reassuring, and led to no meaningful decline in stock price. Thus, Plaintiffs did not and could not discover their Securities Act claims until April 16, 2013, and their claims were, therefore, timely filed.

**C.    Even If the Limitations Period Was Triggered on November 14, 2012, Plaintiffs' Claims Against Certain Securities Act Defendants Are Still Timely**

Even assuming *arguendo* that the District Court was correct in holding that Plaintiffs had until November 14, 2013 to file their claims – Plaintiffs' claims against certain defendants are still timely.[28]

### 1.    Plaintiffs Aare Entitled to the Benefits of Relation Back

Rule 15(c) provides, in relevant part, that: "[a]n amendment to a pleading relates back to the date of the original pleading when … (B) the amendment asserts a claim … that arose out of the conduct, transaction or occurrences set out – or attempted to be set out – in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B). Rule 15(c) provides a very "liberal relation back policy."  *See Villante v. Dep't of Corr. of City of New York*, 786 F.2d 516, 520 (2d Cir. 1986).  Moreover, defendants bear a heavy burden to explain why relation back should not apply to the claims of plaintiffs added to an amended class action.  *In re Simon II Litig.*, 211

---

[28] The District Court erroneously held that under no circumstances would relation back and equitable tolling apply to the Underwriter Defendants because they were not named until November 20, 2013.  SPA-43(Order at 43 nn.2 and 3).  Plaintiffs concede that they are not entitled to relation back under Rule 15(c) as against the Underwriter Defendants.  However, Plaintiffs have found no support, nor did the District Court provide any, for the proposition that equitable tolling does not apply to a newly-named defendant, particularly since the Underwriter Defendants have not claimed that they had no notice of the litigation before they were sued, nor have they asserted any prejudice from a six-day delay.

F.R.D. 86, 146 (E.D.N.Y. 2002), *vacated and remanded on other grounds*, 407 F.3d 125 (2d Cir. 2005).

The Second Circuit has held that Rule 15(c) applies to "a proposed change of plaintiffs." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc*., 106 F.3d 11, 19 (2d Cir. 1997). Relation back is also permitted where a new plaintiff and that plaintiff's new claims have been added. *See, e.g.*, *Bensinger v. Denbury Res., Inc*., No. 10-CV-1917, 2013 WL 3353975, at *4-5 (E.D.N.Y. July 3, 2013) (permitting amendment to add a new plaintiff over seven months after court ruled that the original plaintiff lacked standing because "defendants had adequate notice" and defendants' reasonable possibilities for a defense would not be frustrated); *In re Gilat Satellite Networks, Ltd*., No. 02-1510, 2005 WL 2277476, at *24-26 (E.D.N.Y. Sept. 19, 2005) (amendment adding new plaintiffs and raising new, broader claims related back to the original complaint); *In re Complete Mgmt. Sec. Litig.*, 153 F.Supp.2d 314, 336 (S.D.N.Y. 2001) ("No defendant can credibly complain of surprise that the complaint was amended to include §11 claims based on the 1996 statements, when the original complaint included §10(b) claims based on those facts."). Relation back is generally permitted especially where the defendants have fair notice or would not suffer any undue prejudice. *See In re S. African Apartheid Litig*., 617 F.Supp.2d 228, 290 (S.D.N.Y. 2009) (holding that the prejudice inquiry under Rule 15(c) asks only whether "the late addition of a

plaintiff would surprise and frustrate reasonable possibilities for a defense") (internal quotation marks omitted).

The District Court erroneously concluded that Plaintiffs are not entitled to relation back because the "plaintiffs who originally filed suit lacked standing to bring Section 11 or 12(a)(2) claims,"[29] citing *Police & Fire Retirement System of Detroit v. IndyMac MBS, Inc*., 721 F.3d 95, 112-13 (2d Cir. 2013). SPA-42-43(Order at 42-43). *Indymac*, however, does not apply here. That case involved a group of intervenors that sought to use Rule 15(c) to toll a statute of repose. The intervenors never sought to be, nor were at any time, named parties in the underlying action. In the instant case, the named parties have sought relief under the relation back doctrine and have done so in the context of tolling a statute of limitations, not a statute of repose. Other courts have held that a statute of limitations may be tolled even when the initial plaintiff lacks standing. *See Monroe County Emps. Ret. Sys. v. YPF Sociedad Anonima*, 980 F.Supp.2d 487, 488-90 (S.D.N.Y. 2013) (applying *American Pipe* to toll a statute of limitations on

---

[29] In holding that the Amended Complaint did not relate back, the District Court presumed that none of the initial plaintiffs had purchased in the Offering or had made purchases traceable to the Offering in the aftermarket because there were no allegations to that effect in their complaints. SPA-42(Order at 42) (relying on *DeMaria v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003)). However, the District Court's reliance on *DeMaria* is misplaced. *DeMaria* does not stand for the proposition that lack of standing may be presumed where, as here, the initial plaintiffs did not assert the claim at issue. That the initial plaintiffs did not assert every claim available to them does not necessarily translate into the presumption that they lack standing to bring such claim.

a claim that the initial plaintiff lacked standing to bring); *Wachovia Equity Sec. Litig. v. Wachovia Corp.*, 753 F.Supp.2d 326, 371 (S.D.N.Y. 2011) (tolling statute of limitations even when initial plaintiff lacked standing and noting that "a contrary rule would undermine the policies of 'efficiency and economy of litigation' underlying Rule 23, because '[p]otential class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable'" (citation omitted)). There is no reason to treat tolling under the relation back doctrine differently from the *American Pipe* doctrine; particularly where, as here, the District Court did not find that any of the Securities Act Defendants would be prejudiced by being made to defend claims that, without the benefit of tolling, were brought a mere six days late.

### 2.    Plaintiffs Are Entitled to Equitable Tolling

Relying on *Pace v. DiGuglielmo*, 544 U.S. 408 (2005), the District Court refused to apply the principle of equitable tolling to find that Plaintiffs' Complaint, filed just six days after Defendants contend the limitation period ran (using a November 14, 2012 trigger date), was timely. *See* SPA-43(Order at 43). *Pace* involved a federal *habeas* petition filed by a petitioner who exhibited the opposite of diligence. 544 U.S. at 410-11 & nn.2, 10. As the Court noted, the petitioner "waited years, without any valid justification" and "[h]ad petitioner advanced his claims within a reasonable time of their availability, he would not now be facing

57

any time problem, state or federal." *Id.* at 419 (holding "petitioner's lack of diligence precludes equity's operation").

Here, the facts demonstrate that Plaintiffs acted with diligence throughout the narrow time frame that Plaintiffs seek to toll. Specifically, on April 23, 2013, the initial complaint was filed in this action. The PSLRA notice was published the next day. DelCo moved for lead plaintiff on June 24, 2013 and provided its transaction history showing that it had purchased Magnum Hunter stock, at the offering price, on the date of the Offering. A-16(Dkt. Nos. 38 and 39). Paige was appointed Lead Plaintiff on October 7, 2013. A-22(Dkt. No. 69). On November 20, 2013, just forty-five days later, Plaintiffs filed the Complaint asserting the Securities Act claims. A-27(Dkt. No. 76). The facts here demonstrate that Plaintiffs were proactive in bringing their claims. They brought their claims within *six months* of discovering them on April 16, 2013 and were delayed not by their own lack of diligence, but by operation of the PSLRA. The District Court erroneously held that DelCo should have preserved its claims by initiating a whole new action in the midst of the lead plaintiff appointments. SPA-43(Order at 43) ("DelCo moved for appointment as lead counsel [*sic*] on June 24, 2013 (ECF No. 38), yet it failed to file its own complaint."). The District Court's approach would run afoul of both Rule 23's goal of efficient, streamlined class litigation and the

PSLRA's goal of vesting responsibility for litigating a case in a lead plaintiff appointed by the court.[30]

## CONCLUSION

The Court should reverse the District Court's Order.

---

[30] The District Court also erroneously held, relying on *In re Chaus Sec. Litig.*, 801 F.Supp. 1257, 1265 (S.D.N.Y. 1992), that Plaintiffs had not pled compliance with Section 13 by alleging "the specific 'time and circumstances of the discovery of the fraudulent statement.'" SPA-44(Order at 44). Even assuming a plaintiff must plead compliance with Section 13, *cf. Operating Eng'rs*, 730 F.3d at 270-71 (the Third Circuit recently sided with the Seventh, Ninth and Eleventh Circuits in holding that a Securities Act plaintiff need not plead compliance with Section 13), the Securities Act claims in *Chaus* sounded in fraud and thus were subject to a more stringent Rule 9(b) pleading standard, unlike the claims here.

59

Dated: October 31, 2014

**COHEN MILSTEIN SELLERS & TOLL PLLC**


_____/s/ S. Douglas Bunch_____
Steven J. Toll
Daniel S. Sommers
S. Douglas Bunch
Genevieve O. Fontan
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, DC 20005-3964
Tel.: (202) 408-4600
Fax: (202) 408-4699

Michael Eisenkraft
88 Pine St., 14th Floor
New York, NY 10005
Tel.: (212) 838-7797
Fax: (212) 838-7745

*Attorneys for Lead Plaintiff Edward Paige and Lead Counsel for the Class*

Kimberly Donaldson Smith
Catherine Pratsinakis
**CHIMICLES & TIKELLIS LLP**
One Haverford Centre
361 W. Lancaster Ave.
Haverford, PA 19041
Tel.: (610) 642-8500
Fax: (610) 649-3633

*Counsel for Plaintiff Delaware County Employees Retirement Fund*

Peter Safirstein
Elizabeth Metcalf
**MORGAN & MORGAN, P.C.**

60

28 W. 44th St., Suite 2001
New York, NY 10036
Tel.: (212) 564-1637
Fax: (212) 564-1807

***Counsel for Plaintiffs Mark Hinnau and
Mike Gretschel***

Jonathan Gardner
Angelina Nguyen
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Tel.: (212) 907-0700
Fax: (212) 818-0477

***Additional Counsel for Plaintiffs***

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(A)(7)(C) of the Federal Rules of Appellate Procedure,

the foregoing brief is in 14-Point Times Roman and proportional font and contains

13,975 words and thus is in compliance with the type-volume limitation set forth in

Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated:   Washington, D.C.
         October 31, 2014                _____/s/ S. Douglas Bunch_____
                                         S. Douglas Bunch
                                         Attorney for Lead Plaintiff Edward Paige

# SPECIAL APPENDIX

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Opinion and Order of the Honorable Katherine B.
Forrest, dated June 23, 2014, Appealed From ....... SPA-1

Judgment, dated June 24, 2014, Appealed From ....... SPA-45

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **JUN 2 3 2014**

------------------------------------------------------------X

IN RE MAGNUM HUNTER
RESOURCES CORPORATION
SECURITIES LITIGATION

13 Civ. 2668 (KBF)
and all member and
related cases

OPINION & ORDER

------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

　　Over a relatively short period, Magnum Hunter Resources Corporation

("Magnum Hunter") significantly expanded its operations and added to its

accounting complexity.  Commencing in early 2012—and proceeding in a manner

akin to "death by a thousand cuts"—it disclosed certain control deficiencies,

accounting issues, certain fixes, more deficiencies and accounting issues, more fixes,

and so on.  For more than a year this pattern continued; the company's long-time

auditor resigned; it filed its Form 10-K late; and it got back on track only in the

summer of 2013.

　　On April 23, 2013, following the resignation of its longtime auditor, the first

of what would become several related lawsuits was filed.  A consolidated and

amended complaint ("CAC") was filed on October 7, 2013.  The CAC alleges that

defendants' disclosures of control deficiencies and related accounting issues were

materially false and misleading in large part by failing to disclose the full extent of

Magnum Hunter's issues.

SPA-2

Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder in connection with Magnum Hunter's statements and omissions in a series of Securities and Exchange Commission ("SEC") filings.  Plaintiffs also allege violations of Sections 11, 12(a)(12), and 15 of the Securities Act in connection with Magnum Hunter's May 2012 public offering (the "Offering").

Defendants have moved to dismiss all claims on the basis that, as to the Section 10 and 20 claims, the allegations are insufficient to support an inference that its statements were not false at the time that they were made; that, even if they were, they were not made with an intent to defraud; and that plaintiffs have failed adequately to plead loss causation.  Defendants also claim that the Securities Act statute of limitations bars plaintiffs' Section 11, 12, and 15 claims.

This Court agrees and grants the pending motions.  While it is certainly true that the allegations support an inference of the defendant having had serious control deficiencies and accounting issues over an extended period, there is no factual basis in the complaint to infer that, when the company made its statements—which failed to either reveal the full extent of such issues, or simply failed to foretell the future—it was acting with a knowledge of falsity or an intent to defraud.

I.   BACKGROUND

A. Factual Background

For purposes of this motion, the Court assumes the truth of the following allegations set forth in the consolidated amended complaint ("Compl.," ECF No. 76).

SPA-3

Defendant Magnum Hunter is an oil and gas company engaged in the acquisition, exploration, exploitation, development, and production of crude oil, natural gas, and natural gas liquids in the United States and Canada. (Id. ¶ 2.) The individual named defendants in this action are Magnum Hunter's current and former officers and board members. (Id. ¶¶ 22, 25–28, 35–42.) (Together, Magnum Hunter and the individual named defendants are the "Magnum Hunter defendants.") Plaintiff has also alleged causes of action against Citigroup Global Markets Inc. and Credit Suisse Securities (USA) LLC ("the underwriter defendants"), which acted as underwriters for shares issued pursuant to an allegedly false and misleading registration statement. (Id. ¶¶ 44–45.)

Magnum Hunter grew substantially during 2011 and 2012, increasing its total assets by 470% during fiscal year 2011. (Id. ¶ 3.) Between January 17 and February 29, 2012, the company reported tremendous asset growth, as the company acquired the assets of other companies using money that it raised from offerings of its securities to investors. (Id.) On January 17, 2012, Magnum Hunter issued a press release in which it announced a 235% increase in proved reserves. (Id. ¶ 70.) On January 18 and 19, 2012, Magnum Hunter filed a registration statement and two prospectus supplements for a secondary public offering. (Id. ¶¶ 74–76.) On January 30, 2012, the company announced that its January 17 estimate of its total proved reserves had included miscalculations. (Id. ¶ 75.)

During this period, Magnum Hunter relied on audit services provided by Hein & Associates, LLP. (Id. ¶ 77.) On June 1, 2012, the company announced that

3

SPA-4

it "needed a larger accounting firm with more depth in its professional expertise." (Id. ¶ 87.)  On July 17, 2012, Magnum Hunter hired PricewaterhouseCoopers LLP ("PwC") as its independent auditor for fiscal year 2012.  (Id.)

On February 29, 2012, Magnum Hunter filed its Form 10-K for the fiscal year ending December 31, 2011, which was certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").  (Id. ¶¶ 77, 78.)  In that form, the company stated that its chief executive officer ("CEO") and chief financial officer ("CFO") had "concluded that the Company's disclosure controls and procedures were effective as of December 31, 2011 to ensure: that information required to be disclosed in the reports it files and submits under the Exchange Act is recorded, processed, summarized and reported." (Id. ¶ 77.)

On May 3, 2012, Magnum Hunter released its first quarter 2012 financial results in a Form 10-Q, also attaching SOX certifications; the company stated that the company's management, including its CEO and CFO, had evaluated its "disclosure controls and procedures" and concluded that they were "effective."  (Id. ¶¶ 83, 84.)  Magnum Hunter stated that information required to be disclosed was "accumulated and communicated to our management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure."  (Id.)

Also on May 3, 2012, the company announced a public offering ("the Offering") of 35 million shares of its common stock at $4.50 per share pursuant to the January 18, 2012 prospectus and a May 11, 2012 prospectus supplement.  (Id. ¶ 86.)  On May 11, 2012, plaintiff DelCo purchased shares in the Offering, although

lead plaintiff Edward Paige did not. (See id. p. 79, ¶ 119.) The underwriter
defendants were the lead underwriters of the Offering. (Id. ¶¶ 44, 45.) Plaintiff
allege that the January 18, 2012 Registration Statement and the May 11, 2012
prospectus supplement (collectively, "the Offering Documents"), were "false and
misleading" because they omitted to state that the company (1) lacked sufficient
qualified personnel to design and manage an effective control environment, (2) had
material weaknesses in its financial reporting process, and (3) lacked adequate
internal and financial controls. (Id. ¶ 126.)

According to his LinkedIn profile, Fred J. Smith, Jr., the chief accounting
officer ("CAO") of Magnum Hunter, "inherited various accounting issues . . . and [a]
multiple material internal control weakness[es] environment" when he joined the
company in October 2012. (Id. ¶ 28.)

Plaintiff's complaint includes statements from nine confidential witnesses
("CW") who are former Magnum Hunter accountants. (See id. ¶¶ 48–69.) CWs 1, 4,
and 6 stated that the company failed to implement adequate internal controls,
specifically regarding the company's acquisition of another company ("NGAS") and
regarding joint interest billing ("JIB") accounting. (Id. ¶¶ 51, 52, 54, 62, 64, 66.)
CWs 1, 2, 4, 5, 8, and 9 stated that Magnum Hunter had certain staffing
deficiencies and inadequate experience; for example, the company's controller only
had six months of controller experience and was insufficiently trained, the
accounting staff did not communicate effectively, there was insufficient training,
and there were too few staff members. (Id. ¶¶ 49, 54, 62, 64, 68, 69.) No

SPA-6

confidential witness asserts that any of the named individual defendants had
personal knowledge of accounting problems.

CW 3, an engineering technician who facilitated the reporting of daily oil
production levels, stated that defendant Ferguson requested that CW 3 change
production numbers so that wells' production levels looked more consistent over
time and surpassed the expected performance curve. (Id. ¶¶ 60, 61.) On August 12,
2012, Ferguson told investors that Magnum Hunter's wells were "clearly exceeding
the . . . decline curve that we are projecting." (Id. ¶ 92.) On October 22, 2012,
Ferguson stated that the company had added about a 20% increase over its average
initial production for its wells. (Id. ¶ 97.)

Between October 2012 and April 2013, Magnum Hunter announced certain
accounting errors. On October 22, 2012, the company filed a Form 8-K in which it
stated that, on October 12, it had "discovered an inadvertent error in the calculation
of non-cash share-based compensation" in the company's second quarter 2012 10-Q.
(Id. ¶ 95.) The Form 8-K related that Magnum Hunter's "disclosure controls and
procedures were not effective due to a material weakness in the accounting for
share-based compensation expense." (Id.) However, the form also stated that
"[n]ew procedures and controls [were] being implemented to ensure that
information required to be disclosed . . . [was] recorded, processed, summarized, and
reported," and that the company would use "new and more experienced personnel to
review share-based compensation expense" and implement "software to track such
expenses in order to further strengthen this internal control." (Id. ¶ 95.) In October

6

SPA-7

2012, Magnum Hunter restated its second quarter 2012 financial results and increased its quarterly loss reported by nearly $4 million. (Id. ¶ 6.)

On November 9, 2012, the company filed a Notification of Late Filing on Form 12b-25 stating that it was "working diligently" on a restatement of its financial statements for prior periods, including "evaluating identified control deficiencies and the closing and reporting process." (Id. ¶ 102.)

On November 14, 2012, Magnum Hunter filed a restated second quarter 2012 Form 10-Q identifying several other calculation and accounting errors, including errors with respect to the accounting treatment of a March 2012 financing transaction for the sale of equity in a subsidiary, Eureka Hunter Holdings, LLC. (Id. ¶ 105.) This restatement increased the company's net loss attributable to common shareholders for the first half of 2012 by approximately $6.2 million, which was 3.7% of the company's $167.4 million net loss for all of 2012. (See Stokes Decl. Ex. A, at 6–7; Ex. B, at F-12, ECF No. 105-2.)

In the restated 10-Q, Magnum Hunter stated that it continued to "implement measures designed to improve [its] internal controls" and was "realigning the responsibilities and accountability in the financial reporting process." (Compl. ¶ 105.) The November 14 restated 10-Q also identified three internal control "material weaknesses": (1) the lack of sufficient personnel with the appropriate level of accounting experience; (2) the lack of effective controls over period-end financial reporting; and (3) the lack of effective controls over share-based compensation expenses. (Id.) The company further acknowledged that its "disclosure controls and

7

**SPA-8**

procedures were not effective," which "could result in misstatements that would result in a material misstatement of the consolidated financial statements in a future annual or interim period that would not be prevented or detected." (Id.)

To address these problems, Magnum Hunter disclosed "Remediation Plans" to "continue to evaluate and work to improve [its] internal control over financial reporting. (Id.) These plans included "changes to establish an environment necessary to prevent or detect potential deficiencies in the preparation of [its] financial statements and controls to support [its] desired internal control." (Id.) The company also "hired a new Chief Accounting Officer with the appropriate knowledge and experience to establish and maintain [its] desired control environment." (Id.)

Finally, the restated 10-Q announced that Magnum Hunter was postponing its 2012 annual meeting, and that it had received notice that the SEC would be reviewing the company's preliminary proxy statement. (Id.)

Also on November 14, 2012, Magnum Hunter filed its Form 10-Q for the third quarter of 2012, which contained similar disclosures that it had "identified material weaknesses in [its] internal controls over financial reporting." (Id. ¶ 107.)

In December 2012, the company took a $65 million impairment charge. (Id. ¶ 6.) Magnum Hunter held its 2012 annual meeting in January 2013. (Id.)

On February 28, 2013, the company filed a Notification of Late Filing on Form 12b-25, in which it disclosed that it would be unable to file its 2012 year-end Form 10-K on time and noted that "additional internal controls and significant

8

SPA-9

review of certain financial matters were required by the new auditors." (Id. ¶ 116.)
On March 18, 2013, Magnum Hunter disclosed in a press release that it was facing
"complex and challenging accounting issues" and that, while it was not aware of any
disagreements with PwC "[a]t this time," it was continuing to address internal
control issues. (Id. ¶ 117.)

On April 16, 2013, after it was unable to file its Form 10-K on time, the
company announced in its Form 8-K that it had dismissed PwC at the direction of
the board of directors' audit committee on April 10. (Id. ¶ 119; Decl. of S. Douglas
Bunch ("Bunch Decl.") Ex. 1, ECF No. 112-1.) Magnum Hunter disclosed that PwC
had identified numerous issues involving the company's operations, including that
the company, inter alia:

- Lacked an effective control environment around internal audit, financial
  reporting, and tax and accounting departments, because the company did
  not have sufficient personnel with an appropriate level of knowledge,
  experience, and training;

- Lacked effective monitoring of the period-end financial reporting process,
  consolidations, share-based compensation, acquisitions, and divestitures;

- Lacked effective controls over the accuracy and completeness of master
  files of lease records, well acreage data, and leasehold property costs;

- Lacked effective controls over share-based compensation expense or
  complex equity instruments; and

SPA-10

- Lacked effective controls over income tax accounting or capitalized interest.

(Bunch Decl. Ex. 1, at 5–6.)

According to the Form 8-K, Magnum Hunter believed that the identified matters "arose primarily due to a period of rapid growth of the Company." (Id. at 3.) The company also stated "that information had come to PWC's attention that if further investigated may have a material impact on the fairness or reliability of [the] Company's consolidated financial statements, and this information was not further investigated and resolved to PwC's satisfaction prior to its dismissal." (Id.) However, Magnum Hunter also stated its belief "that it ha[d] implemented the internal controls and processes necessary to develop reliable financial statements and allow its successor independent accounting firm to complete the audit of the Company's consolidated financial statements." (Id.)

On April 17, 2013, Magnum Hunter shares declined $0.49 per share, 14.76%, to close at $2.83 per share. (Compl. ¶ 120.)

On April 18, 2013, PwC sent a letter to the SEC that disputed certain statements that Magnum Hunter had made in its April 10 Form 8-K. (Id. ¶ 121; see also Court Ex. 1, ECF No. 118.) PwC stated that it "agree[d] with . . . the entire second paragraph" of the 8-K, which stated that "there were no disagreements between the Company and PwC on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure." (Court Ex. 1.) PwC also did "not agree with the statements concerning" whether any "reportable

10

SPA-11

events" under the Securities Act had occurred, because it had "advised the Company that information came to [its] attention that [it had] concluded materially impacts the fairness or reliability of the Company's consolidated financial statements." (Id.) The company and PwC both stated that this issue was not "resolved to [PwC's] satisfaction prior to [its] dismissal." (Id.) PwC made no comment with respect to "the Company's descriptions or assessments of the status of the various 'PwC Identified Matters,'" "whether the descriptions of the material weaknesses (including the references to the actual and potential effects) [were] complete and accurate," the company's remediation plan, or the engagement of a new accounting firm. (Id.)

On April 22, 2013, Magnum Hunter disclosed that PwC disagreed with its description of their parting. (Compl. ¶ 121.) On that same day, the price of the company's stock, which had previously traded as high as $7.71 per share, dropped more than 67% to close at $2.50 per share. (Id. ¶ 121.)

After retaining another major accounting firm, BDO USA, LLP, as its new independent auditor, on June 14, 2013, Magnum Hunter filed its Form 10-K for the fiscal year ending December 31, 2012. (Id. ¶ 124.) In its 2012 Form 10-K, the company disclosed that the SEC had advised it on April 26, 2013 of "an inquiry into matters disclosed in certain of our SEC filings and press releases, as well as the sufficiency of our internal controls and our decisions to change auditors." (Id.) The 2012 Form 10-K also disclosed weaknesses in five areas: internal controls, financial

11

SPA-12

reporting, leasehold property costs, complex equity investments, and income tax accounting. (Stokes Decl. Ex. B, at 25, ECF No. 105-2.)

After the issuance of the 2012 Form 10-K, the company's stock price increased, from a low of $2.37 on April 22 to a high of $8.12 on October 21, 2013 and a high of $8.05 on January 15, 2014. (Stokes Decl. Ex. C.)

B. Procedural History

On April 23, 2013, plaintiff Anthony Rosian filed the first complaint in this action. (ECF No. 1.) A number of additional actions were filed thereafter. On October 7, 2013, the Court consolidated all actions and appointed Edward Paige lead plaintiff and Cohen Milstein Sellers & Toll PLLC lead counsel. (ECF No. 69.) On November 20, 2013, plaintiffs filed a consolidated amended complaint. (ECF No. 76.)

The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder based on, inter alia, Magnum Hunter's statements and omissions in a series of SEC filings: its 2011 Form 10-K, its first quarter 2012 Form 10-Q, its October 2012 Form 8-K, its restated second quarter 2012 Form 10-Q, its February 2013 Form 12b-25, and its March 18, 2013 press release. (Compl. ¶¶ 152–166.) The complaint also alleges violations of Sections 11, 12(a)(2), and 15 of the Securities Act against the Magnum Hunter defendants on behalf of purchasers in the Offering. (Id. pp. 79–83 ¶¶ 113–139.) Finally, the complaint alleges violations of Sections 11 and 12(a)(2) of the Securities Act against the underwriters of the Offering. (Id. pp. 79–83 ¶¶ 113–132.)

SPA-13

On January 15, 2014, defendants filed motions to dismiss the consolidated amended complaint pursuant to Rule 12(b)(6). (ECF Nos. 96, 101.) The motions became fully briefed on March 14, 2014. (ECF Nos. 111, 114, 115.) The Court heard oral argument on March 31, 2014.

II.    APPLICABLE LEGAL PRINCIPLES

A.    Rule 12(b)(6) Motions to Dismiss

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In applying that standard, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in plaintiff's favor, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id. Furthermore, the Court will give "no effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007).

B.    Violations of Section 10(b) and Rule 10b-5

To state a cause of action under Section 10(b) or Rule 10b-5, plaintiffs must set forth sufficient plausible allegations that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or

13

SPA-14

sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance

was the proximate cause of their injury." In re IBM Corp. Sec. Litig., 163 F.3d 102,

106 (1998); see also Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005);

Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).

"Securities fraud claims are subject to heightened pleading requirements that

the plaintiff must meet to survive a motion to dismiss." ATSI Commc'ns, Inc. v.

Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  First, plaintiffs must satisfy Rule

9(b), which requires that they "state with particularity the circumstances

constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The Private Securities

Litigation Reform Act ("PSLRA") further requires that a securities complaint

"specify each statement alleged to have been misleading, the reason or reasons why

the statement is misleading, and, if an allegation regarding the statement or

omission is made on information and belief, . . . all facts on which that belief is

formed."  15 U.S.C. § 78u-4(b)(1)(B); see also ATSI, 493 F.3d at 99 (explaining that

plaintiffs "must (1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were

made, and (4) explain why the statements were fraudulent").

"[T]he maker of a statement is the entity with authority over the content of

the statement and whether and how to communicate it."  Janus Capital Grp., Inc. v.

First Derivative Traders, 131 S. Ct. 2296, 2303 (2011).

1.    Actionable misstatement or omission

The first element of a Section 10(b) or Rule 10b-5 securities fraud claim is an

actionable misstatement or omission.  For a misstatement to be actionable, the

allegations must support both falsity and materiality. See Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988).

a.   Falsity

To adequately allege falsity, a plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69 (2d Cir. 2001) (alteration in original). To show actionable falsity, "plaintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004); accord Kleinman v. Elan Corp., plc, 706 F.3d 145, 152–53 (2d Cir. 2013).

An allegedly material misstatement must have been false at the time that it was made. See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 812–13 (2d Cir. 1996) (explaining that "plaintiffs have not alleged circumstances to show that the defendants lacked a reasonable basis for their optimistic, but qualified predictions as to the company's future performance"). A statement that was believed to be true when made, but was later shown to be false, is insufficient; there is no actionable falsity in such a circumstance. See id. Put another way, without contemporaneous falsity, there can be no fraud. See Novak, 216 F.3d at 309 (explaining that "fraud by hindsight" is not actionable). Falsity is not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made. See, e.g., San Leandro, 75 F.3d at 813.

When a plaintiff asserts that statement of belief or opinion was false, "liability lies only to the extent that the statement was both objectively false and

15

SPA-16

disbelieved by the defendant at the time it was expressed." <u>Fait v. Regions Fin.</u>

<u>Corp.</u>, 655 F.3d 105, 110 (2d Cir. 2011); <u>see</u> <u>City of Omaha, Neb. Civilian Emps.'</u>

<u>Ret. Sys. v. CBS Corp.</u>, 679 F.3d 64, 67–68 (2d Cir. 2012) (stating that the same

reasoning applies under Section 10(b)). "Statements regarding projections of future

performance may be actionable . . . if they are worded as guarantees or are

supported by specific statements of fact, or if the speaker does not genuinely or

reasonably believe them." <u>In re IBM Corp. Sec. Litig.</u>, 163 F.3d at 107 (citations

omitted).

"[F]or an omission to be considered actionable under § 10(b), the defendant

must be subject to an underlying duty to disclose." <u>Levitt v. J.P. Morgan Sec., Inc.</u>,

710 F.3d 454, 465 (2d Cir. 2013). "Silence, absent a duty to disclose, is not

misleading under Rule 10b-5." <u>Basic</u>, 485 U.S. at 239 n.17. Section "10(b) and Rule

10b-5 do not create an affirmative duty to disclose any and all material

information." <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 131 S. Ct. 1309, 1321 (2011);

<u>see also</u> <u>Resnik v. Swartz</u>, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of

information is not required . . . simply because it may be relevant or of interest to a

reasonable investor.").

A duty to disclose under Rule 10b-5 "may arise either: (1) expressly pursuant

to an independent statute or regulation; or (2) as a result of the ongoing duty to

avoid rendering existing statements misleading by failing to disclose material

facts." <u>Thesling v. Bioenvision, Inc.</u>, 374 F. App'x 141, 143 (2d Cir. 2010) (citing 17

C.F.R. § 240.10b-5(b)). "[T]he lack of an independent duty is not [necessarily] a

16

SPA-17

defense to Rule 10b-5 liability because upon choosing to speak, one must speak truthfully about material issues." Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 331 (2d Cir. 2002) ("Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete.").

### b.  Materiality

Additionally, to be actionable under Section 10(b) and Rule 10b-5, the allegations must support the materiality of the misstatement or omission.  A misstatement or omission "is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares." Azrielli v. Cohen Law Offices, 21 F.3d 512, 518 (2d Cir. 1994) (citing Basic, 485 U.S. at 241). "Material facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001).

"The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 445 (1976).  Courts have been "careful not to set too low a standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information." Matrixx, 131 S. Ct. at 1318 (internal quotation marks and citations omitted). "When contingent or speculative future events are at issue, the materiality of those events depends on a balancing of both the indicated probability that the event will

17

**SPA-18**

occur and the anticipated magnitude of the event in light of the totality of company activity." Castellano, 257 F.3d at 179 (internal quotation marks and citations omitted). "[I]n such circumstances no single event or factor is necessarily determinative of the materiality inquiry." Id.

"[R]osy predictions," Novak, 216 F.3d at 315, and "expressions of puffery and corporate optimism do not give rise to securities violations." Rombach, 355 F.3d at 174. Such statements are not actionable because they "are too general to cause a reasonable investor to rely upon them."[1] ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009); see Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (holding that statements that a company's "business strategies [would] lead to continued prosperity . . . consist of precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable") (internal quotation marks omitted).

     2.   Scienter

Scienter is the "mental state embracing intent to deceive, manipulate, or defraud" by the maker of a statement. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007). When deciding a motion pursuant to Rule 12(b)(6), the "inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322–323 (emphasis in original). "A

---

[1] The concept of "puffery" also bears on whether a misstatement is actionably false under the securities laws; courts and investors are often unable to evaluate whether such vague and general statements are in fact "true" or "false."

18

SPA-19

complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

"The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994); accord Novak, 216 F.3d at 311. Motive and opportunity require plausible allegations that the maker of a statement could realize, and had the likely prospect of realizing, concrete benefits by the misstatement. See Shields, 25 F.3d at 1130. "Motives that are generally possessed by most corporate directors and officers," such as the corporate profit motive, "do not suffice." Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001). "[T]he 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." ECA, 553 F.3d at 198.

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior" or recklessness "by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Kalnit, 264 F.3d at 142 (internal quotation marks and citation omitted). "Intentional misconduct . . . encompasses deliberate illegal behavior." Novak, 216 F.3d at 308. Reckless conduct is "conduct which is highly unreasonable and which represents an extreme departure from the standards of

19

SPA-20

ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." In re Carter-Wallace, Inc., Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000); see also Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000); Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness.").

Plausible allegations that a defendant knew or had access to information contradicting material public statements, but then ignoring such facts or proceeding despite them, can be sufficient to plead recklessness. See Novak, 216 F.3d at 308–309. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Id. at 309. Mere allegations of corporate mismanagement are not actionable. See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 479 (1977).

### 3. Loss causation

A plaintiff must also set forth sufficient facts to support loss causation in order to state a Section 10(b) or Rule 10b-5 claim; however, this requirement is not meant to impose a great burden. See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346–47 (2005). The Second Circuit has not yet determined whether the "heightened pleading requirements of Rule 9(b)" apply to allegations of loss causation. Acticon AG v. China N. East Petroleum Holdings Ltd., 692 F.3d 34, 37–38 (2d Cir. 2012). A short, plain statement that "provide[s] a defendant with some indication of the loss and the causal connection that the plaintiff has in mind" is sufficient. Dura, 544 U.S. at 347.

20

SPA-21

To plead loss causation adequately, a plaintiff must allege both that the loss was foreseeable—that "the risk that caused the loss was within the zone of risk concealed by the misrepresentations or omissions"—and that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell, 396 F.3d at 172–73 (emphasis in original).

"[W]here . . . substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment." Lentell, 396 F.3d at 177. Accordingly, adequately pleading loss causation requires more than merely alleging that a company's shares declined substantially in value proximate to the revelation of the falsity of some prior statement. See Dura, 544 U.S. at 343.

A plaintiff can adequately plead loss causation by alleging "that the market reacted negatively to a corrective disclosure regarding the falsity" of a misstatement. Lentell, 396 F.3d at 175. Such a corrective disclosure must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 511 (2d Cir. 2010).

21

SPA-22

C.    Section 20(a) Control Person Liability

Section 20(a) of the 1934 Act imposes liability on "control persons."  Section

20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or any rule or regulation thereunder shall also be
> liable jointly and severally with and to the same extent as such controlled
> person to any person to whom such controlled person is liable, unless the
> controlling person acted in good faith and did not directly or indirectly induce
> the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "To establish a prima facie case of control person liability, a

plaintiff must show (1) a primary violation by the controlled person, (2) control of

the primary violator by the defendant, and (3) that the defendant was, in some

meaningful sense, a culpable participant in the controlled person's fraud." ATSI,

493 F.3d at 108.

D.    Violations of Sections 11, 12(a)(2), and 15 of the Securities Act

"Sections 11 and 12(a)(2) of the Securities Act impose liability on certain

participants in a registered securities offering when the registration statement or

prospectus contains material misstatements or omissions. . . . Section 11 imposes

strict liability on issuers and signatories, and negligence liability on underwriters,

in case any part of the registration statement, when such part became effective,

contained an untrue statement of a material fact or omitted to state a material fact

required to be stated therein or necessary to make the statements therein not

misleading.  Section 12(a)(2) imposes liability under similar circumstances for

misstatements or omissions in a prospectus.  And § 15 imposes liability on

individuals or entities that control any person liable under §§ 11 or 12." Panther

22

SPA-23

Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 120 (2d Cir. 2012)

(alterations, citations, and internal quotation marks omitted).

"Neither scienter, reliance, nor loss causation is an element of § 11 or §
12(a)(2) claims which—unless they are premised on allegations of fraud—need not
satisfy the heightened particularity requirements of Rule 9(b) of the Federal Rules
of Civil Procedure." Id.

III.   DISCUSSION

Plaintiffs' claims are based on an alleged series of material misstatements or
omissions in SEC filings and SOX certifications as well as in Magnum Hunter's
Offering Documents.

For instance, on January 30, 2012, Magnum Hunter acknowledged that its
January 17, 2012 press release had contained miscalculations. (Id. ¶¶ 70, 75.) In
the company's 2011 Form 10-K, filed on February 29, 2012, Magnum Hunter
assured investors, allegedly falsely, that they had designed adequate internal
controls and procedures and evaluated their effectiveness. (Compl. ¶¶ 77, 78.) On
May 3, 2012, in their first quarter 2012 Form 10-Q, defendants again assured
investors, again allegedly falsely, that their controls and procedures were effective.
(Id. ¶¶ 83, 84.)

Plaintiffs also allege that, in admitting certain errors, defendants made
misstatements and omissions by disclosing some, but not all, of the pervasive
control deficiencies. In a Form 8-K filed on October 22, 2012, defendants stated
that they were implementing new procedures and controls. (Id. ¶ 95.) However,
defendants then admitted certain errors that increased the company's loss

23

SPA-24

attributable to common shareholders. (Id. ¶¶ 105, 116, 117.) In their restated second quarter 2012 Form 10-Q, filed on November 14, 2012, defendants stated, allegedly falsely (or at least omitting to tell the full truth), that they were implementing measures to improve their controls and accountability over reporting. (Id. ¶ 105.) In their Form 12b-25 filed on February 28, 2013, defendants stated that they would be unable to file their 2012 Form 10-K on time, but allegedly did not reveal the full truth regarding the company's internal controls. (See id. ¶ 116.) In a March 18, 2013 press release, defendants disclosed certain "material weaknesses," but stated, again allegedly falsely (or at least omitting to tell the full truth), that they were implementing measures to address material control weaknesses. (Id. ¶ 117.)

Plaintiffs also claim that the Offering Documents (the registration statement and prospectus supplement) omitted deficiencies in Magnum Hunter's control environment that it did not disclose until April 2013—for example, that Magnum Hunter "lacked sufficient qualified personnel" and had "material weaknesses in, among other things, its financial reporting process." (Id. ¶ 126.)

Finally, plaintiffs allege that, in August 2012, defendant Ferguson made misstatements to investors that the Eagle Ford site was exceeding the company's projections. (Id. ¶¶ 92, 97.)

A.    The Sections 10(b) and 20(a) and Rule 10b-5 Claims

1.    Actionable misstatements or omissions

Plaintiffs allege that, in these various filings, defendants repeatedly assured investors that they had "[d]esigned" and "[e]valuated the effectiveness" of their

24

controls (see, e.g., id. ¶ 78), yet followed those statements with later admissions of errors and material weaknesses.

Despite the litany of alleged disclosures and problems followed by more disclosures, plaintiffs' allegations fail to support a plausible inference that defendants' statements were materially false when made. "[A]llegations of . . . accounting irregularities, standing alone, are insufficient to state a securities fraud claim." Novak, 216 F.3d at 309.

Instead, taking the allegations as true and all inferences in plaintiffs' favor, the allegations do not plausibly support falsity. The fact that defendants recognized problems, announced that they were implementing effective controls and procedures, and then recognized more problems does not indicate that their statements were false at the time that they were made.

Plaintiffs argue that the November 2012 restatement constitutes an admission of falsity (see Pls.' Mem. of L. in Opp. to Defs.' Mot. to Dismiss ("Pls.' Opp.") 19 n.9, ECF No. 111). See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made."). However, the fact that the November 2012 restatement was of "modest size"—it increased Magnum Hunter's loss by less than five percent—actually undercuts an inference of fraud. See Plumbers & Pipefitters Local Union No. 719 Pension Trust

SPA-26

Fund v. Conseco, Inc., No. 09 Civ. 6966 (JGK), 2011 WL 1198712, at *22 (S.D.N.Y. Mar. 30, 2011).

In addition, plaintiffs attempt to use confidential witnesses to show that certain conditions plagued the company throughout the relevant period that the company did not reveal to investors, and that defendants were aware of these problems. However, plaintiffs' use of confidential witnesses does not rectify the fact that they do not adequately plead falsity. While these witnesses are certainly able to muster a litany of criticisms of accounting practices, the CAC does not include any who support an inference that defendants' statements or omissions regarding their controls were known to be false at the time made; rather, the inference is one of an oversight failure of management. See Abrams v. Baker Hughes Inc., 292 F.3d 424, 433 (5th Cir. 2002) (explaining that accounting problems that led to a restatement could "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). In fact, on March 18, 2013, the company acknowledged that it might "identify additional material weaknesses as it finalizes its financial statements for fiscal 2012," and that its "rapid growth . . . resulted in complex and challenging accounting issues and operational integration matters." (Compl. ¶ 117.) In light of those admissions, Magnum Hunter's dismissal of its auditor and its disclosure of material weaknesses on April 16, 2013 (id. ¶ 116) do not support an inference that its prior statements were materially false.

26

SPA-27

Plaintiffs also argue that PwC's April 18, 2013 letter to the SEC, which stated its disagreement with Magnum Hunter's account of their parting, demonstrates that Magnum Hunter's own account—in its April 10 Form 8-K—was false. (See Compl. ¶ 121.) However, the Form 8-K and PwC's letter to the SEC, while inconsistent in certain respects, likewise fail to support plaintiffs' claims regarding material misstatements or omissions. Magnum Hunter specifically disclosed on April 16 that "information had come to PWC's attention that if further investigated may have a material impact on the fairness or reliability of [the] Company's consolidated financial statements, and this information was not further investigated and resolved to PwC's satisfaction prior to its dismissal." (Compl. ¶ 119; Bunch Decl. Ex. 1, at 3.) That statement is materially similar to PwC's statement that it had "advised the Company that information came to our attention that we concluded materially impacts the fairness or reliability of the Company's financial statements and this issue was not resolved to our satisfaction prior to our dismissal." (Compl. ¶ 121.) In its April 18 letter, PwC also "agree[d]" that "there were no disagreements between the Company and PwC on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure." (Court Ex. 1.) Thus, a comparison of Magnum Hunter's Form 8-K with PwC's letter to the SEC does not show that the earlier SEC filing contained any actionable misstatements.

Plaintiffs' allegations that Ferguson requested that CW 3 "change" production numbers (id. ¶¶ 60, 61) also fail to support a claim. CW 3 does not allege

27

that the changed numbers were fraudulent, does not identify any specific numbers that were changed, states that Ferguson made these changes after consulting with "the pumper" or "the foreman," and does not tie the changed numbers to a specific misstatement. (See id. ¶¶ 60, 61.) Plaintiffs also do not allege with particularity that Ferguson's statements to investors in August 2012 that the Eagle Ford site had achieved "predictability" and was "clearly exceeding" the company's projections, and that the company was experiencing "a significant enhancement of [its] income" (Compl. ¶¶ 92, 97) were materially false.

> 2. Scienter

Even if plaintiffs could allege an actionable material misstatement or omission, they have failed to adequately plead scienter, that is, a "mental state embracing intent to deceive, manipulate, or defraud." Tellabs, 551 U.S. at 319. Scienter "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields, 25 F.3d at 1128. A "strong inference" of scienter is required. See Tellabs, 551 U.S. at 314.

First, plaintiffs do not allege that defendants—notwithstanding their various statements regarding the company's internal controls and accounting errors—had the "motive and opportunity to commit fraud" sufficient to support scienter. See Shields, 25 F.3d at 1128. Plaintiffs allege that defendants Evan and Krueger sold 325,000 and 172,500 shares, respectively, of Magnum Hunter stock during the alleged class period. (Compl. ¶¶ 22, 26.) However, plaintiffs "have failed to allege

28

anything 'unusual' or 'suspicious'" about these sales.  In re CRM Holdings, Ltd. Sec. Litig., No. 10 Civ. 975 (RPP), 2012 WL 1646888, at *25 (S.D.N.Y. May 10, 2012).

Plaintiffs also fail adequately to allege scienter using the second possible method, by showing that defendants engaged in "conscious misbehavior or recklessness." See Shields, 25 F.3d at 1128.

Plaintiffs allege that defendants knew or recklessly disregarded that their public statements—representing that the company had evaluated their internal controls and procedures and touting that they were effective—were inaccurate, and that defendants failed to check information that they had a duty to monitor.  (See, e.g., Pls.' Opp. 18 (citing Compl. ¶¶ 78, 83 (stating that "management . . . has evaluated the effectiveness of our disclosure controls and procedures")).)  Under plaintiffs' theory, Magnum Hunter knew of problems related to the valuation of its assets as early as January 2012.  (See Compl. ¶¶ 70, 75.)  While the company disclosed certain internal weaknesses and further errors in October 2012, November 2012, February 2013, and March 2013 (see id. ¶¶ 95, 102, 105), and assured investors that it was implementing remedial measures, the company allegedly did not identify the multitude of problems that existed or reveal how pervasively deficient the company's internal controls actually were until it disclosed PwC's findings to the SEC on April 16, 2013.  (See, e.g., ¶¶ 105, 116, 117.)  Plaintiffs argue that, because Magnum Hunter disclosed on April 16 that PwC had concluded "that internal controls necessary for the Company to develop reliable financial statements

SPA-30

did not exist," defendants had no reasonable basis to have affirmatively assured investors throughout 2012 of the integrity of their internal controls.  (See id. ¶ 119.)

Plaintiffs include in the CAC statements of confidential witnesses as well as other evidence for the proposition that defendants "were aware of the depth and breadth of the internal control deficiencies" at the company, because of their "pervasive, purposeful, and cost-driven accounting practices" and "full disregard for prudent internal controls."  (Pls.' Opp. 23, 25.)  For example, defendant F. Smith's LinkedIn profile stated that he "[i]nherited various accounting issues including . . . [a] multiple material internal control weakness[es] environment."  (Compl. ¶ 28.)  Confidential witnesses also stated—in supposed contradiction with defendants' statements related to designing and evaluating internal controls (see, e.g., id. ¶¶ 78, 83)—that the corporate controller D. Smith was inexperienced, that he was in over his head, and that the former CAO, defendant Kreuger, lacked the desire or training to train staff (see, e.g., id. ¶¶ 49, 54, 62, 64, 69).

Plaintiffs assert that, taken together, these facts give rise to the requisite strong inference of scienter.  See, e.g., Novak, 216 F.3d 300 at 311–12 (explaining that "the defendants made repeated statements to the investment community either offering false reassurances . . . or giving false explanations"); Stocke v. Shuffle Master, Inc., 615 F. Supp. 2d 1180, 1191 (D. Nev. 2009) (finding, after a company stated that it would implement a remediation plan but internal deficiencies were later discovered, that there was "sufficient reason to infer that Defendants acted with reckless disregard in failing to rectify its past internal deficiencies"); In re Top

30

SPA-31

Tankers, Inc. Sec. Litig., 528 F. Supp. 2d 408, 415–16 (S.D.N.Y. 2007) (finding that an auditor's resignation "over disputes . . . concerning accounting practices" contributed to "an inference that there was some deficiency in . . . internal controls, which [made] the SOX certifications more important"); In Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (finding that "a failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter"); Atlas Air, 324 F. Supp. 2d at 492 n.9 ("[W]hen viewed in the light most favorable to the plaintiff, the allegations concerning deficient internal controls bolsters the other factual allegations in the Complaint that tend to show that the individual defendants recklessly issued the company's financial statements.").

This Court disagrees. While Magnum Hunter clearly made numerous accounting errors and revealed internal control weaknesses in dribs and drabs, as it were, over the relevant period, plaintiffs do not allege specific facts allowing for a "strong inference" that defendants acted recklessly in their statements to the public. Rather, it is equally plausible that defendants were in a constant game of "Catch up"—acknowledging the company's material weaknesses and disclosing their continued efforts to resolve them, only to learn of yet more. While this pattern supports an inference of potentially poor accounting management, it does not support fraud. Some examples make this clear.

First, the publication of inaccurate financial results in February and May 2012 that were restated in November 2012 cannot support a strong inference of scienter sufficient to maintain a claim. See Stevelman v. Alias Research, Inc., 174

SPA-32

F.3d 79, 84 (2d Cir. 1999) (rejecting the argument that a company's "subsequent revelation of its accounting policy change and retroactive announcement of lowered earnings should be probative of conscious misbehavior or recklessness").

Magnum Hunter's later statements related to its internal controls likewise do not themselves support an inference of conscious misbehavior or recklessness, even when compared to earlier statements stating that the company was implementing remedial measures. Magnum Hunter continually disclosed ongoing weaknesses in November 2012, February 2013, and March 2013 (see Compl. ¶¶ 105, 116, 117), and stated in March 2013 that it might identify additional material weaknesses (Compl. ¶ 117). The weaknesses that defendants disclosed in late 2012 and early 2013 related to exactly the same issues as the earlier ones: as early as November 2012, defendants acknowledged that it had identified material weaknesses relating to end-of-period financial reporting, share-based compensation, and a "[l]ack of sufficient, qualified personnel to design and manage an effective control environment." (Id. ¶ 105.)

Thus, the complaint does not "support a reasonable belief as to the misleading nature" of the company's statements. See Novak, 216 F.3d at 314 n.1. Even if Magnum Hunter's statements failed to identify every weakness, that alone is insufficient to support an adequate inference of scienter. "A failure 'to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability.'" Conseco, 2011 WL 1198712, at *22 (quoting Novak, 216 F.3d at 309); see Acito v. IMCERA Grp.,

Inc., 47 F.3d 47, 53 (2d Cir. 1995) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.").

Furthermore, the complaint does not allege that Magnum Hunter's disclosure of unresolved control issues on April 16, 2013, after which the company's stock price dropped, was so inaccurate as to support a "strong inference" of scienter with regard to any earlier misstatements or omissions. See Carter-Wallace, 220 F.3d at 39 (explaining that reckless conduct is, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it") (emphasis added). Here, Magnum Hunter had disclosed on March 18, 2013 that it might "identify additional material weaknesses as it finalize[d] its financial statements for fiscal 2012." (Compl. ¶ 117.) The weaknesses that the company identified in April 2013 were of the same type as those that it had disclosed in 2012 and earlier in 2013.

The confidential witnesses' statements (regarding, inter alia, deficient and inadequately skilled accounting staff and improper accounting practices) do not support an inference of the requisite scienter. The issue is not whether Magnum Hunter had inadequate controls at some time during the relevant period, but whether defendants made specific fraudulent disclosures with scienter—that is, with "conscious misbehavior or recklessness." Shields, 25 F.3d at 1128. The allegations as pleaded are insufficient. Rather, defendants disclosed in November

SPA-34

2012 and afterwards that the company had material accounting weaknesses in the core internal control areas of staffing and financial reporting. (See Compl. ¶¶ 105, 116, 117.)

Finally, plaintiffs fail to adequately plead scienter in connection with defendant Ferguson's statements to investors regarding the Eagle Ford site. "Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud." Stevelman, 174 F.3d at 85 (rejecting allegations of "fraud by hindsight").

By contrast, the cases that plaintiffs cite highlight the types of egregious circumstances and particularized allegations that are sufficient to raise a "strong inference" of scienter. See, e.g., Stocke, 615 F. Supp. 2d at 1189–90 (finding that repeated instances of "improper recognition of revenues before they were earned . . . suggest a conscious decision to improperly recognize revenue"); Top Tankers, 528 F. Supp. 2d at 415–16 (explaining that the company's auditor specifically told the company not to include the "seller's credit" in book value, but that the company did so regardless); Veeco, 235 F.R.D. at 231 (involving particularized confidential-witness allegations that attributed knowledge of specific issues to specific individual defendants). Similarly, the restatements on which plaintiffs relied in other cases generally had a greater impact on the company's financial statements than here, where the November 14, 2012 restatement increased Magnum Hunter's loss by less than five percent. See, e.g., Atlas Air, 324 F. Supp. 2d at 483–84 (announcing a $363.8 million restatement followed by bankruptcy).

34

SPA-35

The relevant inquiry for the Court "is whether <u>all</u> of the facts alleged, taken collectively, give rise to a <u>strong</u> inference of scienter, not whether any <u>individual</u> allegation, scrutinized in isolation, meets that standard." <u>Tellabs</u>, 551 U.S. at 322–323 (emphasis added); <u>see also</u> 15 U.S.C. § 78u-4(b)(2)(A) ("[T]he complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."). Here, "a reasonable person" would not "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Id.</u> at 324.

Indeed, other facts alleged in the complaint cut against a strong inference of scienter. For example, after engaging Hein as its auditor for fiscal year 2012, defendants dismissed Hein halfway through 2012, and then hired PwC. (Compl. ¶ 87.) After dismissing PwC, Magnum Hunter then retained BDO USA, LLP, another accounting firm, and successfully filed its 2012 Form 10-K. (<u>See id.</u> ¶ 124.) These facts contribute to an inference not that defendants acted with conscious behavior or recklessness, but rather that they sought to rectify weaknesses. There is no allegation that BDO discovered any additional control weaknesses that Magnum Hunter had not previously reported.

### 3.   Loss causation

Finally, plaintiffs have failed to plead loss causation adequately. "To plead loss causation, the complaint[] must allege facts that support an inference that [defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." <u>Lentell</u>, 396 F.3d at 175

35

SPA-36

(explaining that the plaintiffs failed to plead loss causation because there was "no allegation that the market reacted negatively to a corrective disclosure"); see also Dura, 544 U.S. at 347 (explaining that the complaint failed to claim that the "share price fell significantly after the truth became known," and that the plaintiffs did not provide defendants "with some indication of the loss and the causal connection" that they had in mind).

Plaintiffs allege that Magnum Hunter's stock price declined on April 17, 2013 and on April 22, 2013. (Compl. ¶¶ 7, 22, 120, 121.) Plaintiffs argue that defendants' disclosures on October 22, 2012 and November 14, 2012 only identified limited material weaknesses (see id. ¶ 105), and that the April 16, 2013 Form 8-K, which stated that the company had dismissed PwC after PwC had identified numerous issues involving the company's operations, and its April 22, 2013 disclosure of PwC's letter to the SEC, were "corrective disclosures" leading to the stock price declines. See Lentell, 396 F.3d at 175.

However, the April 2013 statements cannot be regarded as "corrective disclosures." As set forth above, Magnum Hunter did not represent in October or November 2012 that these weaknesses were the only control issues. In fact, the company specifically warned investors on March 18, 2013 that it "may identify additional material weaknesses" and that it was facing "complex and challenging accounting issues." (Compl. ¶ 117.) Because the company disclosed nothing new in April 2013, it is not plausible based on such an allegation, as required to plead loss

36

causation, that the "share price fell significantly after the truth became known."
Dura, 544 U.S. at 347.

For these reasons, plaintiffs have failed to plead that Magnum Hunter's
statements caused the stock price decline.

B.     The Sections 11, 12(a)(2), and 15 Claims

For plaintiffs to state a claim under Section 11 or 12(a)(2) of the Securities
Act, the offering materials for the Offering must have "contained an untrue
statement of a material fact or omitted to state a material fact . . . necessary to
make the statements therein not misleading."  Rombach, 355 F.3d at 168 n.2
(quoting 15 U.S.C. § 77k).  Scienter, reliance, and loss causation are not elements of
a Section 11 or 12(a)(2) claim.  See Panther Partners, 681 F.3d at 120.

1.     The statute of limitations

Securities Act claims must be "brought within one year after the discovery of
the untrue statement or the omission, or after such discovery should have been
made by the exercise of reasonable diligence." 15 U.S.C. § 77m; see also Merck &
Co. v. Reynolds, 559 U.S. 633, 656 (2010) (Stevens, J., concurring in part and
concurring in the judgment) (stating the one-year statute of limitations for
Securities Act claims); Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS,
Inc., 721 F.3d 95, 107 (2d Cir. 2013) (same).

Under the "inquiry notice" rule, the one-year period begins to run when
public information, sometimes called "storm warnings," would lead a reasonable
investor to investigate potential claims. Dodds v. Cigna Sec., Inc., 12 F.3d 346,
349–50 (2d Cir. 1993). In Merck & Co. v. Reynolds, an Exchange Act case, the

SPA-38

Supreme Court held that "the discovery of facts that put a plaintiff on inquiry notice does not automatically begin the running of the limitations period"; rather, "the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered the facts constituting the violation." 559 U.S. at 653 (internal quotation marks omitted). Courts in this circuit have split on whether the Merck "discovery rule" also applies to Section 11 of the Securities Act, or whether the former "inquiry notice" standard still applies. See Pa. Pub. Sch. Emps. Ret. Sys. v. Bank of Am. Corp., 874 F. Supp. 2d 341, 364 (S.D.N.Y. 2012).

The Court need not resolve that question here, because the outcome of this case does not depend on whether Merck applies. Magnum Hunter's substantial disclosures on October 22, 2012 and November 14, 2012 constituted a sufficient "constellation of facts" to satisfy either standard—either to put plaintiffs on inquiry notice or to lead a reasonably diligent plaintiff to have discovered those facts. See Freidus v. Barclays Bank PLC, 734 F.3d 132, 138–39 (2d Cir. 2013) (declining to decide whether the Merck standard applied and finding that, "faced with this constellation of facts, a reasonably diligent investor would have discovered the alleged violations" over a year before the filing of the complaint). Because plaintiffs filed the amended complaint in this action more than one year after Magnum Hunter disclosed that information, plaintiffs' claims are untimely.

Plaintiffs claim that the Offering Documents omitted deficiencies in Magnum Hunter's control environment that it did not disclose until April 2013—for example,

SPA-39

that Magnum Hunter "lacked sufficient qualified personnel" and had "material weaknesses in, among other things, its financial reporting process." (Compl. ¶ 126.) However, in its SEC filings on October 22 and November 14, 2012, Magnum Hunter disclosed more than enough information for plaintiffs to assert these claims, including that the company:

- Was "working diligently to complete [a] Restatement" of prior financial statements, including "evaluating identified control deficiencies and the closing and reporting process" (id. ¶ 102);

- Had "not design[ed] an effective control environment with the sufficient complement of personnel with the appropriate level of accounting knowledge, experience, and training," and "did not maintain effective controls over the period-end financial reporting process, including controls with respect to the preparation, review, supervision, and monitoring of accounting operations" (id. ¶ 105); and

- Had "identified material weaknesses in [its] internal controls over financial reporting in connection with (i) [its] lack of sufficient qualified personnel to design and manage an effective control environment, (ii) [its] period-end financial reporting process and (iii) [its] share-based compensation." (id. ¶ 107).

Those disclosures constituted a "constellation of facts" sufficient for plaintiffs to plead each element of their Securities Act claims and to put reasonable investors on notice of the Securities Act claims that plaintiffs now assert. See Freidus, 734 F.3d

39

SPA-40

at 139.  Magnum Hunter revealed nothing of significance after November 14, 2012 that plaintiffs could not have included in a complaint on that date.

Contrary to plaintiffs' arguments, Magnum Hunter's disclosures in 2012 were neither limited nor vague.  (See Pls.' Opp. 37.)  For example, the company stated in October 2012 that it had "concluded that [its] disclosure controls and procedures were not effective due to a material weakness" (Compl. ¶ 95) and, in November 2012, that it was working toward further evaluation of "control deficiencies" (id. 102); it also identified three specific reasons for its conclusions (id. ¶ 105).  In November 2012, Magnum Hunter also disclosed that there could be "misstatements . . . in a future annual or interim period that would not be prevented or detected" (id.).  Thus, the company had revealed the "specific accounting and financial issues" that later came to light in April 2013 (see Pls.' Opp. 37) in their October and November 2012 filings.

Plaintiffs argue that defendants admitted in June 2013 that its October and November 2012 disclosures had failed to identify most internal control deficiencies.  (See id. at 37–38.)  This argument is without merit.  On June 14, 2013, in the Form 10-K for the period ending December 31, 2012, Magnum Hunter identified five categories of material weaknesses, and stated that the "first and second categories generally resemble the three material weaknesses discussed in the above paragraph"—that is, certain weaknesses that had been identified in October and November 2012.  (See Bunch Decl. Ex. 2, at 25 (emphasis added).)  However, the relevant portion of Magnum Hunter's Form 10-K simply described three categories

40

SPA-41

of information that had not been discussed in the prior paragraph; the company did

not, contrary to plaintiffs' assertion, admit that it had never before disclosed the

other three categories of weaknesses.

Even if plaintiffs were correct that the 2012 disclosures did not include every

problem that the company ultimately disclosed, the statute of limitations for

Securities Act claims is not somehow tolled until the appearance of disclosures that

perfectly match the allegations that a plaintiff chooses to include in its complaint.

See Freidus, 734 F.3d at 139; Staehr v. Hartford Fin. Servs. Grp., 547 F.3d 406, 427

(2d Cir. 2008) (explaining that plaintiffs "need not detail every aspect of the alleged

fraudulent scheme," and that an "investor does not have to have notice of the entire

fraud being perpetrated to be on inquiry notice").  Assuming that plaintiffs had a

valid Securities Act claim based on the Offering, Magnum Hunter's October and

November 2012 disclosures that it had discovered material control weaknesses and

accounting errors were sufficient to put plaintiffs on "inquiry notice," Dodds, 12

F.3d at 349–50, or for a reasonable investor to have discovered the facts constituting

the violation, Merck, 559 U.S. at 653.

Plaintiffs also argue that defendants' "reassuring statements" in its various

filings "prevent[ed] the emergency of a duty to inquire or dissipate such a duty" and

thus prevented the statute of limitations from commencing.  See LC Capital

Partners, L.P. v. Frontier Ins. Grp., 318 F.3d 148, 155 (2d Cir. 2003).  However,

such "reassuring statements will prevent" the statute of limitations from running

"only if an investor of ordinary intelligence would reasonably rely on the statements

41

to allay the investor's concern." Id. (emphasis added).  Whether the statute is delayed depends on "how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the 'reassuring' steps announced to avoid their recurrence."  Id.  Here, Magnum Hunter had already disclosed significant control deficiencies, and itself warned investors not to be overly reassured.  The company cautioned investors that accounting and control deficiencies "could result in misstatements . . . in a future annual or interim period that would not be prevented or detected" and stated that it would "continue to evaluate and working to improve [its] internal control over financial reporting." (Compl. ¶ 105.)  An investor could not reasonably rely on such statements to allay his or her concern.  See LC Capital, 318 F.3d at 155.

Plaintiffs' attempt to benefit from the relation-back doctrine also fails.  Rule 15(c) provides that an "amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  Here, plaintiffs argue that, because the Securities Act claims in the amended complaint arise from the same set of misstatements and omissions as alleged in the original complaint, the amended complaint should relate back to the date of the original complaint, April 23, 2013. However, the plaintiffs who originally filed suit lacked standing to bring Section 11 or 12(a)(2) claims, because they did not allege stock purchases in or traceable to the Offering.  See DeMaria v. Andersen, 318 F.3d 170, 178 (2d Cir. 2003) ("[P]urchasers

SPA-43

who can trace their shares to an allegedly misleading registration statement have standing to sue under § 11 of the 1933 Act."). The only plaintiff that did allegedly purchase shares in the Offering, and thus has standing to sue, was the Delaware County Employees Retirement Fund ("DelCo") (Compl. ¶ 119), which did not originally file a lawsuit. Therefore, whether or not plaintiffs' claims are timely now depends on whether DelCo's claims are "independently timely"; DelCo's claims cannot relate back to the date of Rosian's complaint. See IndyMac, 721 F.3d at 112–13.[2]

Nor are plaintiffs entitled to equitable tolling. "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005). Here, DelCo has long had notice regarding its claim. In fact, DelCo moved for appointment as lead counsel on June 24, 2013 (ECF No. 38), yet it failed to file its own complaint.[3]

Finally, plaintiffs do not allege the time and circumstances of the discovery of their claims, beyond the conclusory statement that "[l]ess than one year elapsed between the time that Plaintiffs or any member of the Class discovered or reasonably could have discovered the facts alleged herein, and the date that this

---

[2] Even if plaintiffs could use the relation-back doctrine with respect to the Magnum Hunter defendants, that argument fails with respect to the underwriter defendants, which plaintiffs added for the first time in the amended complaint. Plaintiffs thus do not meet the requirements for relation back set forth in Rule 15(c) with respect to defendants not previously named in the complaint. See Krupski v. Costa Crociere S. p. A., 560 U.S. 538, 546 (2010); LC Capital, 318 F.3d at 156.

[3] Again, even if plaintiffs could use the equitable-tolling doctrine with respect to the Magnum Hunter defendants, the doctrine would not apply against the underwriters, whom plaintiffs added for the first time in the amended complaint.

SPA-44

Complaint was filed." (Compl. ¶¶ 122, 130.)  Plaintiffs failed to plead, as necessary, the specific "time and circumstances of the discovery of the fraudulent statement." In re Chaus Sec. Litig., 801 F. Supp. 1257, 1265 (S.D.N.Y. 1992).  Plaintiffs therefore fail to meet their burden under the Securities Act.

IV.    CONCLUSION

For these reasons, defendants' motions to dismiss the complaint are GRANTED.  The Clerk of Court shall close the motions at ECF Nos. 96 and 101 and terminate this action.

SO ORDERED.

Dated:      New York, New York
            June 23, 2014

KATHERINE B. FORREST
United States District Judge

44

SPA-45

USDC SDNY

DOCUMENT

ELECTRONICALLY FILED 06/24/2014

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

In Re Magnum Hunter
Resources Corporation
Securities Litigation

13 **CIVIL** 2668 (KBF)
**JUDGMENT**
and all member and
related cases

----------------------------------------------------------X

     Defendants Credit Suisse Securities (USA) LLC and Citigroup Global Markets Inc. having

moved to dismiss (Doc. #101) the Amended Complaint pursuant to Fed. R. Civ. P. 9(b) and

12(b)(6), and Defendants Stephen C. Hurley,  H.C. "Kip" Ferguson, III, Joe L. McClaugherty,

Steven A. Pfeifer, Ronald D. Ormand, David S. Krueger, Jeff Swanson, Victor G. Carillo, J. Raleigh

Bailes, Sr., Gary C. Evans, Magnum Hunter Resources Corporation, Fred J. Smith, Jr., Brad Bynum

also having moved to dismiss (Doc. #96) pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), and the

matter having come before the Honorable Katherine B. Forrest, United States District Judge, and

the Court, on June 23, 2014, having rendered its Opinion & Order (Doc. #123) granting Defendants'

motion to dismiss the complaint and directing the Clerk of Court to close the motions at ECF Nos.

96 and 101 and terminate this action, it is,

     **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Opinion & Order dated June 23, 2014, Defendants' motion to dismiss the complaint is

granted and the Clerk of Court shall close the motions at ECF Nos. 96 and 101; accordingly, the case

is closed.

SPA-46

**Dated:**  New York, New York
June 24, 2014

**RUBY J. KRAJICK**

**Clerk of Court**

**BY:**  *K. Mango*

**Deputy Clerk**